420 A.2d 1050

Frederic M. GEE, Sherwin–Williams Co., Fingerlakes Glass Corporation, Peskin Sign Company, Temple & Peffer, Unloading Corporation, J. Screed, Inc., Leva Bros. Tile & Marble Co., Inc., Mancini & Klimchuck Co., Inc., Enjem's, Inc., Appellants,

v.

Edward R. EBERLE, Charles Elin, Robert G. Guempel, William W. Hagerty, George M. Johnson, James C. Kellogg, III, John S. Roberts, Sefton Stallard, and W. Paul Stillman, Trustees of Hamilton Investment Trust, and Dan Handler, Stanford Freeman, Mercury Construction Corporation and Mercury Properties of Pennsylvania, Inc.

Frederic M. GEE, Sherwin Williams Co., Fingerlakes Glass Corporation, Peskin Sign Company, Temple & Peffer, Unloading Corporation, J. Screed, Inc., Leva Bros. Tile & Marble Co., Inc., Mancini & Klimchuck Co., Inc., Enjem's, Inc., Excel Lighting Products, R.S.E., Inc., d/b/a Wellsboro Asphalt Company, Contractors Equipment Rental, Inc., Rosenthal Chadwick, Inc., Chapel Lumber Co., Rupert Heichel,

v.

Edward R. EBERLE, Charles Elin, Robert G. Guempel, William W. Hagerty, George M. Johnson, James C. Kellogg, III, John S. Roberts, Sefton Stallard, and W. Paul Stillman, Trustees of Hamilton Investment Trust, and Dan Handler, Sanford Freeman, Mercury Construction Corporation and Mercury Properties of Pennsylvania, Inc.

Appeal of R.S.E., INC., d/b/a Wellsboro Asphalt Company.

Superior Court of Pennsylvania.

Argued June 14, 1979.

Filed May 9, 1980.

104

Thomas A. Beckley, Harrisburg, for appellants.

William A. Hebe, Wellsboro, for appellees.

Before SPAETH, STRANAHAN and SUGERMAN, JJ.*

SPAETH, Judge:

This is an appeal from an order denying any recovery by unpaid subcontractors against an owner. The subcontractors claim that they are entitled to recovery because the owner, by accepting their work, has been unjustly enriched.

On May 16, 1974, appellees Sanford Freeman and Daniel Handler executed a mortgage in favor of Hamilton Invest-

* President Judge JOHN Q. STRANAHAN of the Court of Common Pleas, of Mercer County, Pennsylvania, and Judge LEONARD SUGERMAN of the Court of Common Pleas of Chester County, Pennsylvania are sitting by designation.

ment Trust, the trustees of which are also appellees, as security for a loan of $1,350,000 for the construction of a shopping plaza in Wellsboro, Pennsylvania. The mortgage had a provision that allowed the parties to "increase or decrease from time to time [the total amount of the indebtedness], but the total unpaid balance secured at any one time by this Mortgage shall not exceed a maximum principal amount of twice the principal amount stated in the promissory note." Para. 16, Mortgage Agreement at 6. The mortgage incorporated by reference an unrecorded construction loan agreement, which included the following provisions. Of the total amount of the loan, $75,000 was for the acquisition of the premises, and $1,275,000 was for the construction of the improvements. Para. 1, Section 4, Construction Loan Agreement. Advances were to be made periodically, not more often than monthly, Para. 8, Section 4, Construction Loan Agreement, and were to represent 90% of various calculations of the value of the work done at a particular stage of the project. Para. 1, Section 4, Construction Loan Agreement. Any money withheld by the lender during construction would be paid upon satisfaction of the conditions necessary for final payment, which included certification by the lender's architect that the work had been done satisfactorily and the necessary certificates had been obtained from various government agencies. Para. 6, Section 4, Construction Agreement. In order for the borrower to receive a particular advance, it would have to apply to the lender, stating the amount and nature of the costs and giving satisfactory evidence that they were incurred. Para. 3, Section 4, Construction Loan Agreement. Moreover, the lender's architect would have to certify that the work on account of which the advance was sought had been done in a "good and workmanlike manner." Para. 5, Section 4, Construction Loan Agreement. The lender was not obliged to make any advance unless it believed that "all work usually done at the state of construction when the advance is requested has been done in a good and workmanlike manner and all material and fixtures usually furnished and installed at that time had been furnished and installed." Para. 2,

Section 4, Construction Loan Agreement. The lender had the option to disburse the funds to a title insurance company as disbursing agent or directly to the contractors, suppliers, or laborers, instead of to the borrower. Para. 9, Section 4, Construction Loan Agreement.

Hamilton made its first advance on the construction loan on May 29, 1974, and continued to make advances during the remainder of 1974, and in 1975. In June of 1975, one of the buildings in the shopping plaza was substantially completed, and the structural steel work for another of the buildings was half completed. Deposition of Joseph Carl Walsh, April 28, 1977 at 21. On June 6, Freeman and Handler and Hamilton entered into a new construction loan agreement, which, like the original construction loan agreement, was unrecorded. The new agreement reduced the amount of the loan to $1,100,000 because one of the major tenants had pulled out and a new tenant did not want as much space. Deposition of Joseph Carl Walsh, April 28, 1977 at 9. The agreement also stipulated that Hamilton would not have to advance any money beyond $1,050,000 until Freeman and Handler had found a tenant for some of the space that had been left vacant by the major tenant's departure. The agreement left open the possibility that the financing might go as high as $1,200,000 if Freeman and Handler obtained a written commitment for long–term financing from an institutional lender.

At the time of the June 6 agreement, Hamilton had advanced $648,000. On June 10, Hamilton advanced $162,-005.56, of which $87,005.56 went to a title company that had been engaged to clear up existing liens on the property. In July, August, and September, respectively, Hamilton advanced $70,000, $110,000, and $105,000 to Freeman and Handler. Deposition of Joseph Carl Walsh, April 28, 1977 at 17. As of the last advance, on September 22, Hamilton had advanced a total of $1,049,342.69 towards the project.[1] On

1. The record indicates that on December 24, 1975, $32,834.20 was returned to Hamilton from a title company that had previously received money from Hamilton to clear up liens on the project.

January 26, 1976, Hamilton instituted mortgage foreclosure proceedings against Freeman and Handler because they had failed to make interest payments on August 1, 1975, September 1, 1975, October 1, 1975, November 1, 1975, December 1, 1975, and January 1, 1976. Sometime after instituting the foreclosure proceedings, Hamilton completed the project. A sheriff's sale was held on June 23, 1976, at which time Hamilton purchased the property for $500,000. Hamilton expended a total of $1,202,138.60 on the property, both before and after it acquired it.

Appellants are 11 subcontractors out of a group of 16 who performed work on the project in 1974 and 1975 and were never paid by Freeman and Handler. Exhibit B of the Stipulated Facts contains the following record of their work:

EXHIBIT "B"

| Name of Plaintiff | Work Commenced | | | Work Completed | | |
|---|---|---|---|---|---|---|
| Frederic M. Gee | September | , | 1975 | October | 4, | 1975 |
| Sherwin Williams Co. | August | 31, | 1975 | October | 29, | 1975 |
| Fingerlakes Glass Corporation | September | 1, | 1975 | October | 17, | 1975 |
| Peskin Sign Company | September | 2, | 1975 | October | 16, | 1975 |
| Temple & Peffer | September | , | 1974 | October | 12, | 1975 |
| Unloading Corporation | September | 3, | 1975 | October | 16, | 1975 |
| J. Screed, Inc. | June | , | 1974 | October | 27, | 1975 |
| Leva Bros. Tile & Marble Co., Inc. | December | 20, | 1974 | October | , | 1975 |
| Mancini & Klimchuck Co., Inc. | September | 24, | 1975 | October | 21, | 1975 |
| Enjem's, Inc. | July | 14, | 1975 | October | 31, | 1975 |
| R.S.E., Inc., d/b/a Wellsboro Asphalt Co. | July | 10, | 1975 | October | 25, | 1975 |

The record makes it clear that of the subcontractors on the project, only one, Rosenthal Chadwick, Inc., which was granted relief by the court below and is not a party to this appeal, had more than an extremely limited knowledge of the financing between Freeman and Handler and Hamilton. Irving Rosenthal of Rosenthal Chadwick testified that when

Deposition of Joseph Carl Walsh, April 28, 1977 at 6. Thus, the actual total advanced was $1,016,508.49.

payments on his contract did not come through during the summer of 1975, he spoke to an official of Hamilton, who assured him that the project was adequately financed. N.T. at 7, 7/12/77. Rosenthal also testified that he mentioned his discussion with Hamilton to "many" of the other subcontractors on the project, but that "the only portion that I may have related to them is I found out there appeared to be sufficient money to complete the job. I didn't get into the specifics of this." N.T. at 7, 7/12/77. Most of the subcontractors who testified suggested that they had performed their work in response to assurances by Freeman and Handler as owners that there was adequate financing. None of them, however, verified with Hamilton that there was adequate financing.[2] Several of the subcontractors received a letter from Freeman and Handler in November 1975, stating there was adequate financing, but most of the subcontractors had by then stopped work. N.T. 18, 24, 26, 34, 7/12/77.

When there was no further communication from Freeman and Handler, appellants filed the following mechanics' liens against the property:

| Mechanic's Lien Holders | Number and Term | Date of Filing | Amount Claimed |
|---|---|---|---|
| Frederic M. Gee | 1371 C.D. 1975 | 12/ 5/75 | $ 6,617.93 |
| Sherwin Williams Co. | 1436 C.D. 1975 | 12/18/75 | 873.15 |
| Fingerlakes Glass Corporation | 1443 C.D. 1975 | 12/19/75 | 12,554.00 |
| Peskin Sign Co. | 1452 C.D. 1975 | 12/22/75 | 6,678.00 |
| Temple & Peffer | 1456 C.D. 1975 | 12/24/75 | 5,256.82 |
| Unloading Corporation | 1472 C.D. 1975 | 12/31/75 | 3,785.00 |
| J. Screed, Inc. | 12 C.D. 1976 | 1/ 6/76 | 17,500.00 |
| Leva Brothers Tile & Marble Co., Inc. | 124 C.D. 1976 | 2/ 3/76 | 4,090.56 |
| Mancini & Klimchuck Co., Inc. | 155 C.D. 1976 | 2/ 9/76 | 18,994.06 |
| Enjem's, Inc. | 248 C.D. 1976 | 2/27/76 | 27,387.53 |
| R.S.E., Inc., d/b/a Wellsboro Asphalt Company | 223 C.D. 1976 | 2/24/76 | 34,578.47 |

---

2. Richard Bernard of Fingerlakes Glass testified that he tried to talk to Hamilton but received no cooperation and referred the matter to his credit company. N.T. at 34, 7/12/77.

The liens were in effect until the property was sold at the sheriff's sale on June 23, 1976. Just prior to the sheriff's sale, appellants as lien holders obtained a temporary order from the lower court enjoining Hamilton, Freeman and Handler from transferring the property free and clear of the liens. A hearing on the rule to show cause why the order should not be made permanent was to be held, but instead the proceeding was continued indefinitely and the prothonotary marked the judgment docket lis pendens against Hamilton. Eventually, by the parties' arguments, pleadings and stipulation of fact, the proceeding was converted from one seeking a permanent injunction to "that of imposing a constructive trust upon the theory of unjust enrichment." Slip op. of lower court at 5.

By amended order entered November 2, 1978, the lower court ordered "that a constructive trust in the amount of eleven thousand forty dollars ($11,040.00) with interest from November 5, 1975, is hereby imposed against the real estate sold at the sheriff's sale held on June 23, 1976, purchased by the Mortgagee, Hamilton Investment Trust as described in [the recorded] mortgage .... The Prothonotary shall index the case as a verdict entered in the amount of eleven thousand forty dollars ($11,040.00) with interest from November 17, 1975 in favor of Rosenthal Chadwick, Inc., Plaintiff." Record at 34a. The court granted Rosenthal Chadwick this adequate recovery because it had relied on Hamilton's assurances of financing. The court refused to grant the other subcontractors any recovery because they were unable to show that they had relied on any assurances from Hamilton. As already indicated above, Hamilton has not appealed from the order in favor of Rosenthal Chadwick. The subcontractors denied recovery have appealed.

As appellants, the subcontractors argue that their unsatisfied claims against Freeman and Handler should be satisfied out of Hamilton's unexpended loan funds on the project, namely, the difference between the $1,016,508.49 [3] that Hamilton advanced to Freeman and Handler and the $1,350,000 that was originally agreed upon in the mortgage

3. See note 1, *supra*.

and the accompanying loan agreement. Appellants maintain either that Hamilton should be declared a constructive trustee of this unexpended fund, or that they should be held to have an equitable lien upon the fund; the "label" chosen, they say, is unimportant. Appellant's Brief at 12.[4]

**4.** Appellants have made other arguments, but these require only brief comment.

Appellants argue that they were third party beneficiaries of the contractual relationship between Freeman and Handler as owners/borrowers and Hamilton as lender. In *Spires v. Hanover Fire Ins. Co.*, 364 Pa. 52, 56–57, 70 A.2d 828, 830 (1950), the Supreme Court stated that:

To be a third party beneficiary entitled to recover on a contract it is *not enough that it be intended by one of the parties to the contract* and the *third person* that the latter should be a beneficiary, but *both parties to the contract* must so intend and must indicate that intention in the contract; in other words, a promisor cannot be held liable to an alleged beneficiary of a contract ·unless the latter was within his contemplation at the time the contract was entered into and such liability was intentionally assumed by him in his undertaking; the obligation to the third party must be created, and must affirmatively appear in the contract itself. [Citations omitted.]

Here, there are some provisions in the Mortgage and the accompanying Construction Loan Agreement that might be read as intending to confer benefit on the subcontractors. Paragraph 9 of the Mortgage states:

The undersigned Mortgagor [Freeman and Handler] hereby represents and warrants that all property, fixtures and equipment described herein will be paid for and free from all liens, encumbrances, title retaining contracts and security interests when delivered and/or installed upon the Premises, and it is agreed that such property, fixtures and equipment shall be deemed to be realty and a part of the freehold.

Mortgage Agreement at 5.

Moreover, Paragraph 15 of the Construction Loan Agreement states: Borrower will cause the construction of the improvements to be prosecuted with diligence and continuity and will complete the same strictly in accordance with the Plans on or before the Completion Date referred to in Exhibit B, and will keep the Premises and Improvements free of liens or claims for liens for material supplied and for labor or services performed in connection with the construction of the Improvements . . . .

Construction Loan Agreement at 8.

Paragraph 17 of the Construction Loan Agreement states:

Borrower will receive the advances to be made hereunder and will hold the right to receive the same as a trust fund for the purpose of paying the costs of construction of the Improvements and it will apply the same solely for such purpose, except that that portion of the Loan constituting the Purchase Money Loan, as such term is

defined in Paragraph 4(1) hereof, will be used solely for the purpose of paying for acquisition of the Premises.

Construction Loan Agreement at 8.

However, as against these provisions, Paragraph 7 of Section 5 of the Construction Loan Agreement states:

All conditions of the obligations of Lender to make advances hereunder are imposed solely and exclusively for the benefit of Lender and its assigns and no other persons shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make advances in the absence of strict compliance with any or all thereof and no other person shall, under any circumstances, be deemed to be beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender at any time if in its sole discretion it deems it advisable to do so.

Construction Loan Agreement at 22.

Paragraph 3 of Section 11 of the Construction Loan Agreement also states:

Except as hereinabove otherwise specifically provided, the parties do not intend the benefits of this Agreement to inure to any third party. Notwithstanding anything contained herein or in the Mortgage, Note, or any other document executed in connection with this Agreement, or any conduct or course of conduct by any of the parties hereto, before or after signing this Agreement or any of the other aforesaid documents, this Agreement shall not be construed as creating any rights, claims or causes of action against the Lender, in favor of the General Contractor or any other contractor, subcontractor, supplier of labor or materials, or any of their respective creditors, or any other person or entity other than Borrower. Without limiting the generality of the foregoing, advances made directly to the General Contractor or any other contractor, subcontractor or supplier or labor or materials, whether or not the payments are approved by Borrower, shall not be deemed a recognition by the Lender of a third–party beneficiary status of any such person or entity.

Construction Loan Agreement at 32–33.

Given the last two provisions, we conclude that Hamilton and Freeman and Handler did not intend that the subcontractors should be third party beneficiaries of either the Construction Loan Agreement or the Mortgage. *See Pioneer Plumbing Supply Co. v. Southwest Savings & Loan Assoc., infra.*

Appellants also argue that their mechanics' liens survived the sheriff's sale because of the temporary injunction barring Hamilton from transferring the property free and clear of the liens. It is settled that a sheriff's sale divests any mechanics liens so that the purchaser takes possession of unencumbered property. *Rosenberg v. Cupersmith*, 240 Pa. 162, 87 A. 570 (1913). When Hamilton purchased the property at the sheriff's sale, the property was therefore free and clear of the liens. The Sheriff was not a party defendant to the injunction, nor did the injunction enjoin the sale. The sale having divested the liens, the injunction became meaningless.

The Supreme Court has said that a constructive trust "is not really a trust at all but rather an equitable remedy." *Buchanan v. Brentwood Federal Savings & Loan Ass'n,* 457 Pa. 135, 151, 320 A.2d 117, 126 (1974); *See also Kimball v. Barr Township,* 249 Pa.Super. 420, 378 A.2d 366 (1977). As such, it "is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Buchanan v. Brentwood Federal Savings & Loan Ass'n, supra,* 457 Pa. at 152, 320 A.2d at 127. A constructive trust may arise "even though the acquisition of property was not wrongful and the defendant's intention was not malign. Our courts focus not on intention, but on the result of unjust enrichment." *Kimball v. Barr Township, supra* 249 Pa.Super. at 425, 378 A.2d at 368. *See also Roman Mosaic and Tile Co., Inc. v. Vollrath,* 226 Pa.Super. 215, 218, 313 A.2d 305, 307 (1973); *see generally Restatement of Restitution,* §§ 160, 194 (1937).

This court recently had before it a case in which appellants' theory was tested on a slightly different set of facts. In *Myers–Macomber Engineers v. M.L.W. Construction Corp. and HNC Mortgage and Realty Investors,* 271 Pa.Super. 484, 414 A.2d 357 (1979), a developer had given a mortgage of $5,850,000 as security for a construction loan. After the lender had advanced $2,900,000, the developer defaulted. The lender foreclosed and subsequently purchased the development at a sheriff's sale. One of the unpaid subcontractors sought to recover from the lender $11,298.98 for site–preparation work on the theory that the lender had been unjustly enriched. In denying recovery, this court noted that prior to the developer's default, the lender had already advanced the money budgeted for site preparation. Given that advance, the court concluded that it could not be said that by receiving the benefit of the site preparation work, the lender had been unjustly enriched; it

Finally, we need not reach appellants' argument in response to appellees' motion to dismiss the appeal, since we understood appellees to withdraw this motion at oral argument.

had been enriched, but since it had paid for the work, not unjustly.

Appellants rely on *Morgan–Oswood and Associates, Inc., of Fla. v. Continental Mortgage Investors*, 323 So.2d 684 (Fla.1975). There, a contractor finished a hotel but the lender refused to make a final advance on the project because meanwhile the owner had defaulted. The court found that the lender had been unjustly enriched because it had received the security of a completed hotel[5] without making all the advances required under the construction loan agreement. *Accord Trans Bay Engineers and Builders, Inc. v. Hills*, 551 F.2d 370 (D.C.Cir.1976) (contractor may recover retained mortgage payments from mortgagee assignee where contractor finished construction project); *Bennett Construction Co. v. Allen Gardens, Inc.*, 433 F.Supp. 825 (W.D.Missouri 1977) (*semble*); *F. W. Eversley and Co., Inc. v. East N.Y. Non–Profit HDRC, Inc. et al.*, 409 F.Supp. 791 (S.D.N.Y.1976) (*semble*); *Miller v. Mountain View Savings & Loan Assn.*, 238 Cal.App.2d 644, 48 Cal.Rptr. 278 (1966) (a trust may be imposed on undisbursed mortgage funds in favor of claimants who complete project because through their efforts lender has received the security it bargained

5. In *J. G. Plumber Service Inc. v. Coastal Mortgage Co.*, 329 So.2d 393 (Fla.App.1976), the court distinguished *Morgan–Oswood* on the ground that there the work had been completed. The court said that where, as in the case before it, the work on a project was only partially completed at the time of default, a lender cannot be said to be unjustly enriched because "[m]ore often than not, the market value of a partially constructed building will be substantially less than the total cost of the labor and material which has already been incorporated into its construction." 329 So.2d at 395. We need not decide whether a lender may be unjustly enriched where it forecloses on a partially completed project, because here, by the time the sheriff's sale occurred, Hamilton had virtually completed the project. It would seem at least arguable, however, that the fact that a project is only partially completed when the lender forecloses should not necessarily bar a subcontractor from prevailing on an unjust enrichment theory, if the subcontractor can show that in some manner the lender's return at the sheriff's sale was enhanced because of the subcontractor's work. *See Doud Lumber Co. v. Guaranty Savings & Loan Assn., infra; Miller v. Mountain View Savings & Loan, infra. Cf. McBain v. Santa Clara Savings & Loan Association, infra* (equitable lien imposed even though project only partially completed).

for); *Sutro v. Paramount Plastering, Inc.,* 216 Cal.App.2d 433, 31 Cal.Rptr. 174 (1963) (*semble*); *Whiting Mead Co. v. West Coast Bond and Mortgage Co.,* 66 Cal.App.2d 460, 152 P.2d 629 (1944) (*semble*).

It will be observed that *Myers–Macomber* and *Morgan–Oswood* may be regarded as supplementing each other. Where *Morgan–Oswood* explicitly held that recovery will be allowed on proof of unjust enrichment, *Myers–Macomber* may be read as implicitly holding that such recovery will be allowed, denying it not as a matter of legal principle but rather because on the facts, there was no unjust enrichment. However, *Myers–Macomber* may be read more narrowly, as going no further than assuming *arguendo*, without holding, that recovery will be allowed on proof of unjust enrichment, thus leaving undecided the issue of legal principle. Given this uncertainty, we must consider and decide *de novo*, so to speak, whether under Pennsylvania law an unpaid subcontractor should be permitted to recover against a lender upon proof that as a result of the subcontractor's work, the lender has been unjustly enriched.[6]

It is important to start this consideration by noting that we are not concerned with a situation where an unpaid subcontractor asserts a right to recover on some theory other than unjust enrichment. Recently, we had occasion to consider the subject of an unpaid subcontractor's rights, in *Bornstein v. Macy et al.,* 278 Pa.Super. 156, 420 A.2d 477 (1980). There, unpaid subcontractors sought recovery against an owner on the basis of what they characterized as an "equitable" right. This asserted right, however, did not

---

**6.** This issue has not been decided by *R. M. Shoemaker Co. v. Southeastern Pennsylvania Development Corporation et al.,* 275 Pa. Super. 594, 419 A.2d 60 (1980). In that case, this court held that a lender that had withheld advances to a contractor was not unjustly enriched where the lender had not gone into possession or acquired title to the property, nor had profited from the transaction. That case is distinguishable from this one on its facts, and its dictum that a mechanic's lien was the contractor's sole avenue for its claim is not dispositive of this case. Indeed, *Shoemaker* cites *Myers–Macomber*, which implicitly held that a subcontractor might recover against a lender if the facts showed that the subcontractor's work had unjustly enriched the lender.

involve the right to recover for unjust enrichment, for on the facts, no unjust enrichment was, nor could it be, pleaded; the owner had paid all that was due; the money had been deposited with the court, and the dispute was whether the unpaid subcontractors or certain creditors of the owner were entitled to it. We held that

> [u]nder established principles, subcontractors may proceed against an owner in either of two situations: if there is a direct, or express, or "actionable," promise by the owner to pay the subcontractors [citations omitted]; or if the contract between the owner and the general contractor contains a promise "for the benefit of all the subcontractors who [have] not been paid" [citations omitted]. 278 Pa.Super. at 115, 420 A.2d at 486.

Since neither of those situations prevailed, we denied recovery. In doing so, we expressly noted that whether a subcontractor may recover on proof of unjust enrichment was not an issue pertinent to our decision.

As already noted, this issue has been decided in other jurisdictions. *See Morgan–Oswood and Associates, Inc., of Fla. v. Continental Mortgage Investors, supra,* and the other cases in *accord,* cited *supra.* Before deciding whether to follow these cases, however, it should be noted that there is another line of cases at least implicitly if not explicitly *contra.* As has been stated, *Morgan–Oswood* involved a claim by an unpaid subcontractor against a lender, on the theory that the lender had been unjustly enriched because the value of its security had been enhanced as a result of the subcontractor's work. Suppose, however, that the unpaid subcontractor claims that the owner, rather than the lender, has been unjustly enriched. Will the action lie? In many jurisdictions, the answer is that it will not. It would seem to follow that in those jurisdictions, cases such as *Morgan–Oswood* would not be followed, on the basis that no distinction should be made between the liability of an owner and of a lender, so far as an unpaid subcontractor is concerned. Furthermore, cases denying recovery against an owner are especially pertinent to the present case, for Hamilton may

be regarded, so far as its possible liability on a claim of unjust enrichment is concerned, either as a lender or as an owner. It will be recalled that Hamilton started out as a lender, but when Freeman and Handler defaulted, it bought the property at sheriff's sale and as owner, completed the project.

Cases involving the liability of an owner on a claim of unjust enrichment include the following: *Constanzo v. Stewart*, 9 Ariz.App. 430, 453 P.2d 526 (1969) (subcontractor recovered from owner on unjust enrichment theory where owner received benefit of subcontractor's services, did not pay contractor for them, knew that subcontractor was concerned about payment, and had assured subcontractor that escrow arrangements for payment had been made); *G and B Contractors, Inc. v. Coronet Developers*, 134 Ga.App. 916, 216 S.E.2d 705 (1975) (subcontractor may not recover from owner where no privity of contract between them); *Bishop v. Flood*, 133 Ga.App. 804, 212 S.E.2d 443 (1975) (subcontractor may not recover from owner where subcontractor failed to pursue lien or garnishment remedies); *Dale's Service Co. v. Jones*, 96 Idaho 662, 534 P.2d 1102 (1975) (subcontractor may not recover from owner where owner did not agree to pay subcontractor for work); *Indianapolis Raceway Park v. Curtiss*, Ind.App., 386 N.E.2d 724 (1979) (subcontractor may not recover from owner where no showing that owner acted wrongfully or in misleading manner); *Guldberg v. Greenfield*, 259 Iowa 873, 146 N.W.2d 298 (1966) (subcontractor may not recover from owner where owner paid contractor for work and subcontractor had not taken advantage of mechanics' lien law); *Pay–N–Taket, Inc. v. Crooks*, 259 Iowa 719, 145 N.W.2d 621 (1966) (subcontractor may not recover from owner where subcontractor did not file mechanic's lien); *Pendleton v. Sard*, Me., 297 A.2d 889 (1972) (subcontractor may not recover from owner where subcontractor did not first sue contractor); *Custer Builders, Inc. v. Quaker Heritage, Inc.*, 41 App.Div.2d 448, 344 N.Y.S.2d 606 (1973) (subcontractor may not recover from owner where owner made no promise to subcontractor); *George M. Morris*

*Constr. Co. v. Four Season's Motor Inn, Inc.*, 90 N.M. 654, 567 P.2d 965 (1977) (subcontractor may not recover from owner because of existence of lien remedy); *McLaughlin Elec. Supply v. Am. Empire Ins.*, S.D., 269 N.W.2d 766 (1978) (subcontractor ordinarily has no remedy against owner other than mechanic's lien); *Pascall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150 (1966) (supplier of materials has cause of action against owner even though no contractual relationship if owner had not paid an party for materials and supplier had exhausted remedies against party it had contracted with); *Crockett v. Brady*, Tex.Civ.App., 455 S.W.2d 807 (1970) (subcontractor may not recover against owner where subcontractor has no reason to believe that anyone other than contractor will pay him); *Crockett v. Sampson*, Tex.Civ.App., 439 S.W.2d 355 (1969) (*semble*); *Schneider v. Delwood Center, Inc.*, Tex.Civ.App., 394 S.W.2d 671 (1965); (employee of tenant may not recover against landlord for work done benefiting landlord).

These cases, it will be observed, may be divided into three categories: those that require proof that the owner has engaged in some wrongdoing or misrepresentation; those that require proof that the subcontractor has exhausted statutory or contractual remedies; and those that require some sort of direct contractual relationship between the subcontractor and owner. It is not apparent to us, however, why a subcontractor should have to satisfy any of these additional requirements to make out a case of unjust enrichment.

■ As regards the requirement of proof of wrongdoing or misrepresentation: We have specifically held that on a claim of unjust enrichment, a showing of wrongdoing or wrongful intent on the part of the benefited party is not necessary. Thus, in *Kimball v. Barr Township*, 249 Pa.Super. 420, 425, 378 A.2d 366, 368 (1977), in discussing the imposition of a constructive trust because of unjust enrichment, we stated that a constructive trust may be imposed "even though the acquisition of the property was not wrongful and the defendant's intention was not malign. Our

courts focus not on intention, but on the result of unjust enrichment." Even more specifically, in *Roman Mosaic and Tile Co., Inc. v. Vollrath*, 226 Pa.Super. at 218, 313 A.2d at 307, *supra*, we stated that to recover on a claim of unjust enrichment, "appellant must show that [Mrs. Vollrath] wrongfully secured or *passively received* a benefit that it would be unconscionable for her to retain." (Emphasis added.)[7] Finally, in *Scott v. Purcell and The Oaklander Associates*, 264 Pa.Super. 354, 399 A.2d 1088 (1979), we held, citing *Roman Mosaic and Tile*, that the appellant was entitled to recover on a claim of unjust enrichment against a corporation that had purchased property from one who was supposed to buy it for the appellant, notwithstanding the failure to show any wrongdoing by the corporation.

■ As regards the requirement of exhaustion of remedies: No doubt in most cases, the preferable remedy from the unpaid subcontractor's point of view will be to file a mechanic's lien. This will be so because the remedy is so expeditious and drastic; the lien may be easily filed, and once filed, may preclude the owner from selling the property until the lien has been satisfied. However, we see no reason why a subcontractor who for some reason does not file a lien should be penalized by being unable to recover on a claim of unjust enrichment. By not filing a lien, the subcontractor will have lost the considerable procedural advantages given him by the mechanics' lien law. That is penalty enough. To go further, and deny the subcontractor any recovery at all, even when the subcontractor can show that the owner, or lender, has been unjustly enriched, seems to us to serve no useful purpose, and to be inconsistent with the principle of such cases as *Kimball v. Barr Township*, that "[o]ur courts focus ... on the result of unjust enrichment." A similar

7. Whether a party has been unjustly enriched must be judged on a case–by–case basis. The focus is necessarily on the intentions of the parties to the transaction. Depending on what they are, it may or may not be "unconscionable" for a party to retain a benefit it has received. Where, for example, one party gives a second one a piece of property with no expectation of payment in return, it would not be "unconscionable" for the second party to retain the property.

observation may be made regarding the requirement that a contractual remedy must be exhausted. Assuming that an owner has been unjustly enriched as the result of an unpaid subcontractor's work, we see no reason why the owner should be entitled to retain that enrichment simply because the subcontractor has for some reason failed to sue the general contractor.

■ Finally, as regards the requirement of some sort of direct relationship between the subcontractor and the owner: The cases imposing this requirement seem to us to ignore the fact that the essence of the doctrine of unjust enrichment is that there is no direct relationship between the parties. Sometimes, of course, there will be a direct relationship, in the form of a promise either to the subcontractor or for the benefit of the subcontractor. In such a case, the subcontractor has a right to recover on the promise. *See Bornstein v. Macy, supra.* The existence of that right, however, precludes a claim of unjust enrichment. Thus in *Roman Mosaic and Tile Co., Inc. v. Vollrath, supra,* we stated:

> The doctrine of unjust enrichment is clearly "inapplicable when the relationship between the parties is founded on a written agreement or express contract. *Third National Bank & Trust Co. of Scranton v. Lehigh Valley Coal Company,* 353 Pa. 185, 193, 44 A.2d 571 (1945)." *Schott v. Westinghouse Elec. Corp.,* 436 Pa. 279, 290, 259 A.2d 443, 448 (1969).

> 226 Pa.Super. at 218, 313 A.2d at 307.

Here, the unpaid subcontractors do not assert any contractual right to recover against Hamilton, whether Hamilton be regarded as lender or owner, nor does it appear that they could assert any such right. Given this fact, we see no reason to hold that they may not assert a claim of unjust enrichment.

There is at least one decision that is opposed to the cases requiring an unpaid subcontractor to prove wrongful conduct by the owner, or exhaustion of remedies, or some sort

of direct relationship with the owner. In *S. and M. Rotogravure Service, Inc. v. Baer*, 77 Wis.2d 454, 252 N.W.2d 913 (1977), the Wisconsin Supreme Court held, simply, that a contractor who had done work for a tenant of a building could recover from the landlord on a claim of unjust enrichment where the contractor's work enhanced the value of the building and the landlord had not paid anyone for the work. We acknowledge that this appears to be a minority view. We nevertheless think it sound, and consistent with our decisions on the nature of a claim of unjust enrichment.

With this conclusion reached, the question arises, which, if any, of the unpaid subcontractors in the present case are entitled to recover on a claim of unjust enrichment? The answer to this question is that we do not know. On the one hand, several of the subcontractors, Frederic Gee, Sherwin Williams Co., Fingerlakes Glass Corporation, Peskin Sign Company, Unloading Corporation, and Mancini and Klimchuk Co., Inc., began their work at a time when it is unlikely that Hamilton could have made advances on their behalf. This is so because advances were made on the basis of the prior month's work and these subcontractors began their work on the last day of August or in September, when the last advance to Freeman and Handler was made. On the other hand, the other subcontractors, Temple & Peffer, J. Screed, Inc., Leva Bros. Tile & Marble Co., Inc., Enjem's Inc., and R.S.E., Inc. d/b/a Wellsboro Asphalt Company, began their work considerably before the last advance was made. It is therefore possible that Hamilton made advances [8] to pay for their work in which event Hamilton may not be said to be unjustly enriched, even if the subcontractors did not receive the advances from Freeman and Handler. *See Myers–Macomber Engineers v. M.L.W. Construction Corp. and HNC Mortgage and Realty Investors, supra.*

**8.** These advances, if they occurred, represented only 90% of the value of the subcontractors' work. Para. 1, Section 4, Construction Loan Agreement. These subcontractors might therefore still have a claim against Hamilton for 10% of the value of their work.

In order to determine what rights, if any, the subcontractors may have against funds in Hamilton's possession,[9]

9. On remand, appellants will have to demonstrate that there is a specific *res* upon which a constructive trust may be imposed. Under a constructive trust or an equitable lien theory, an essential requisite is an identifiable *res*, that is, a debt, duty, or obligation owing by one person to another. *In Re Penn Central Transportation Company*, 323 F.Supp. 77 (E.D.Pa.1971). In *Philadelphia v. Mancini*, 431 Pa. 355, 360, 246 A.2d 320 (1968), the Supreme Court stated:

In that class of cases, where a constructive trust is sought to be impressed on funds which are required to be withheld for another under a duty imposed by law or by agreement, there must be some specific funds set aside or collected for the other's account by the person sought to be charged as constructive trustee. [citations omitted]

The record below may disclose any of the following possibilities: that Hamilton originally set up a $1,350,000 account for the project and there are sufficient funds remaining in that account to pay the appellants; that the original account had sufficient funds to pay the appellants but no longer does; or that the original account was no longer in existence at the time appellants performed their work and any further disbursements made on the project afterwards were in a separate account. If the first possibility turns out to be the case, appellants will have no difficulty establishing a *res* consisting of the unexpended funds. Nor will the appellants have difficulty establishing a *res* if the second possibility is the case. In *Kimball v. Barr*, *supra*, 249 Pa.Super. at 247, 378 A.2d at n.3, we stated:

Although appellant alleges that he no longer possesses the funds provided by Barnes and Tucker, this does not prevent us from impressing a constructive trust on appellee. If appellee is to be successful in holding appellant liable as a constructive trustee, it must establish that a *res* exists or existed upon which a constructive trust can be impressed. See Restatement of Restitution § 160 (1937). However, if appellant held property at any point in time which properly can be decreed the subject of a constructive trust, the mere fact that he does not now hold such property will not preclude the imposition of personal liability upon it for the improper disposition of such property.

The final possibility would present the greatest obstacle to finding a *res*. If Hamilton can show that there were no funds in the original account and that the original account no longer existed at the time the appellants performed their work, then Hamilton might argue that it never held any money for appellants in a discrete account. The case might then be analogized to *Philadelphia v. Mancini, supra*, where the Court refused to impose a constructive trust on behalf of the city of Philadelphia for unpaid wage taxes since it was unable to show that the defendant–subcontractor had placed any funds for this purpose in a separate account. It should be noted, however, that as the record stands now, it indicates that after appellants performed their work Hamilton continued to pay other workmen from the original account set up for the project. Plaintiff's Exh. No. 10. It

we shall remand this case to the lower court. *See Bedillion v. Wilson Stave Company, Inc., et al.*, 271 Pa.Super. 292, 413 A.2d 411 (1979); *Frowen v. Blank*, 242 Pa.Super. 276, 363 A.2d 1267 (1976). The court, after further testimony, if that is necessary, should review each subcontractor's claim and determine whether the claim was covered in any of the advances made, and if not, whether Hamilton was unjustly enriched as a result of the work being done. Having completed its determination, the court should make findings of fact and conclusions of law, which can be reviewed on any further appeal.

Since the case must be remanded, it is in order to discuss two additional arguments made by appellants. If not resolved now, the lower court and the parties will be uncertain about how to proceed on remand.

Appellants argue that Hamilton was necessarily unjustly enriched by appellants' work because after it purchased the property at the sheriff's sale, it resold the property to a third party for $1,400,000, reaping a "profit" of just under $385,-000, since it had made only $1,016,508.49 in advances to Freeman and Handler. We are not persuaded by this argument.

Appellants neither pleaded the resale in their complaint nor amended the complaint to do so. The fact of the resale is therefore not of record. As an appellate court we may not consider facts or materials referred to in a party's brief but not of record. *Acker v. Palena*, 260 Pa.Super. 214, 218, 393 A.2d 1230, 1231 n.2 (1978); *In the Interest of Carroll*, 260 Pa.Super. 23, 393 A.2d 993, 995 n.4 (1978).

Assuming that on remand the lower court decides that evidence of the resale is admissible—and we do not mean to intimate what the court's decision on this point should be—we note that the evidence would not necessarily be determinative. In *Miller v. Mountain View Savings and Loan Assn., supra*, a developer had defaulted on a completed

therefore seems unlikely that Hamilton can show that the original account had been closed at the time appellants performed their work.

project, the lender refused to advance funds owing a subcontractor, bought the project at a sheriff's sale for the amount it had expended on the project, and then sold the property to a third party for an additional $10,000. The issue was whether the lender could credit back the unexpended portion of the loan against the balance of the loan without satisfying the subcontractor's claim. The court found that the subcontractor could recover out of the unexpended loan fund, but did not find the evidence of the resale relevant. The court stated:

> It is therefore unnecessary to determine what effect the subsequent resale by [the lender] had upon the respective rights and obligations of it, as lender, and respondent as claimant. It has been conceded in this case that the sale by [the lender] cut off any right [the subcontractor] had under his recorded claim or lien. It may be assumed that he had no other right in the property itself or in the proceeds from the subsequent sale. It was therefore error to receive the evidence concerning that sale.

> 238 Cal.App.2d at 665, 48 Cal.Rptr. at 292.

This appears to hold that once the lender purchases the property at the sheriff's sale, the subcontractor has no right to participate in any subsequent profit. We agree in part with this proposition. If the lender has in fact made advances to pay for the work of a subcontractor, it has satisfied its obligation—so far as it is concerned, it has paid for the work—and the subcontractor may not claim part of the proceeds of the profit on an unjust enrichment theory. If, however, the lender has not made advances to pay for the work of the subcontractor, the subcontractor may be entitled to recover from the lender on a claim of unjust enrichment. On that claim, evidence of resale may be relevant as tending to show the value to the lender of the subcontractor's work.

Appellants also argue that an equitable lien should be imposed on Hamilton's unexpended loan funds on the basis of appellants' reliance on the existence of the funds and on certain assurances that Freeman and Handler gave them with respect to the funds. In support of this argu-

ment, appellants have cited several California cases. *See Doud Lumber Co. v. Guaranty Savings & Loan Assn.*, 254 Cal.App.2d 585, 60 Cal.Rptr. 94 (1967); *McBain v. Santa Clara Savings & Loan Association*, 241 Cal.App. 829, 51 Cal.Rptr. 78 (1966); *Hayward Lumber and Investment Co. v. Const. Federal Savings & Loan Assn.*, 47 Cal.App.2d 211, 117 P.2d 682 (1941); *Smith v. Anglo California Trust Co.*, 205 Cal. 496, 271 P. 898 (1928). However, we do not choose to follow these cases, which in any event no longer seem to be the law in California.[10]

The California cases do not deal with the issue of whether subcontractors may rely on a loan fund where the fund may originally have been sufficient to meet their claims, but over the course of the project was reduced by the parties to the loan. That is what occurred here. Appellants argue that Hamilton should be held to its original obligation to supply $1,350,000, but to accept that argument would mean that

10. Section 3264 of the California Civil Code, West's Ann.Civ.Code § 3264 provides:

The rights of all persons furnishing labor, fixtures, equipment or materials for any work or improvement, with respect to any fund for payment of construction costs are governed exclusively by [mechanic's lien proceedings] and no person may assert any legal or equitable right with respect to such fund, other than a right created by direct written contract between such person and the person holding the fund, except pursuant to the provisions of such chapters.

It seems to be agreed that this provision abolished the equitable lien theory relied on in several of the cases, *see e. g., Doud Lumber Co. v. Guaranty Savings & Loan Assn., supra*; *McBain v. Santa Clara Savings & Loan Assn., supra*, and the unjust enrichment theory relied on in *Miller v. Mountain View Savings & Loan Assn., supra*; *Sutro v. Paramount Plastering Inc., supra*; and *Whiting Mead Co. v. West Coast Bond and Mortgage Co., supra. Connolly Development, Inc. v. Superior Court*, 17 Cal.3d 803, 132 Cal.Rptr. 477, 553 P.2d 637 (1976); *Boyd and Lovesee Lumber Company v. Modular Marketing Corporation*, 44 Cal.App.3d 453, 118 Cal.Rptr. 699 (1975). *See* Gutierrez, *California Civil Code Section 3264 and The Ghost of the Equitable Lien, infra* at 513. It should be noted, however, that the need to resort to equitable remedies is less pressing in California where subcontractors have a statutory right to garnish loan funds in the lender's possession provided proper notice is given. Such a garnishment will survive any foreclosure on the land by the lender. *Connolly Development, Inc. v. Superior Court, supra*, 17 Cal.3d at 809, 826–827, 132 Cal.Rptr. at 481, 493, 553 P.2d at 641, 653.

parties to a loan would lose their freedom to alter its terms. Furthermore, to give effect to third party reliance on the existence of a loan fund might have unfortunate consequences for the construction industry. The lender would be subjected to "unbargained for risk," which might well lead to higher interest rates, more restrictive loan policies, and the inevitable squeezing out of smaller developers. *See* Gutierrez, *California Civil Code Section 3264 and The Ghost of the Equitable Lien*, 30 *Hastings L.J.* 493, 521 (1979). As an illustration of such a risk: an unscrupulous owner or developer might misrepresent to the subcontractors the extent of the financing. To protect itself the lender would have to disclose to each participant in a project at the outset the exact terms of the financing agreements. The lender would also have to inform participants of any changes in the agreements. This obligation might discourage a lender from engaging in a project. Finally, contrary to the assertions of subcontractors generally, it is not clear that lenders are better predictors of developer default than they are. *See* Lefcoe and Schaffer, *Construction Lending and the Equitable Lien*, 40 So.Cal.L.Rev. 439, 447 (1967). To impose liability on lenders on the theory that they are better predictors, and therefore better risk averters, than subcontractors, would in our opinion be to act on the basis of inadequate information.

We therefore conclude that a contractor or subcontractor must show that it relied on assurances of adequate financing from the lender itself, in order to recover from the lender on a reliance theory. In *Pioneer Plumbing Supply Co. v. Southwest Savings & Loan Assoc.*, 102 Ariz. 258, 428 P.2d 115 (1967), an Arizona court suggested just such a rule. *Cf. Demharter v. First Federal S. and L. Assn. of Pittsburgh*, 412 Pa. 142, 194 A.2d 214 (1963).[11] Here, only one of the

11. Appellants at one point in their brief fault Hamilton for pursuing the project in June 1975 rather than foreclosing since Freeman and Handler had by then defaulted on the payments due February 1, March 1, April 1, and May 1, 1975. Appellants suggest that Hamilton's motive in not foreclosing was to make sure that appellants had done their work and produced a completed project before it foreclos-

subcontractors was able to make this showing. As has been indicated, Rosenthal of Rosenthal Chadwick testified that he had called Hamilton and spoken to an official administering the project, who assured him that the owners were "strong" and that "everything seems okay." N.T. at 7, 7/12/77 Hearing. Based on this conversation, Rosenthal Chadwick continued to work on the project.

The order of the lower court is reversed and the case is remanded for further proceedings consistent with this opinion.

ed. It is clear that by June 1975, Freeman and Handler showed signs of financial instability; nevertheless they were in default only in an amount of $24,610.00, N.T. 18, 7/12/75 Hearing, and the June 6 Construction Loan Agreement included an amended payment schedule. In *J.G. Plumber Service Inc. v. Coastal Mortgage Co., supra,* a subcontractor also made a claim that a lender had acted fraudulently when it knew the owner had defaulted but delayed in asserting its rights to allow the subcontractor to continue his work and enhance the value of the project. The court rejected this argument, stating that to accept it would place an unwarranted affirmative duty on the lender to inform contractors and subcontractors of the status of mortgage payments and might discourage a lender from trying to get a mortgagee to correct its default. 329 So.2d at 395. Like the Arizona court in *Pioneer Plumbing Supply Co. v. Southwest Savings & Loan Assoc., supra,* the Florida court would only hold the lender liable where it had affirmatively mislead the subcontractor as to the owner's status and the financing for the project.