In re SACRED HEART HOSPITAL OF NORRISTOWN, d/b/a Sacred Heart Hospital and Rehabilitation Center, Debtor.

SKILLED NURSING PROFESSIONAL SERVICES, A DIVISION OF SKILLED NURSING HOME CARE, INC., and Facilities Management, Inc., Plaintiffs,

v.

SACRED HEART HOSPITAL OF NORRISTOWN, d/b/a Sacred Heart Hospital and Rehabilitation Center, Defendant,

and

Midlantic Bank, N.A., successor to Continental Bank, and Allmed Financial Corporation, Intervening Defendants.

Bankruptcy No. 94–13275DAS.
Adv. No. 94–0490DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 2, 1994.

Vincent J. Marriot, III, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, for debtor.

Mark S. Halpern, Furman & Halpern, P.C., Bala Cynwyd, PA, for Skilled Nursing

Professional Services, a Div. of Skilled Nursing Home Care, Inc., and Facilities Management, Inc.

John J. Koresko, V, Koresko & Noonan, Norristown, PA, for certain employee claimants.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

J. Gregg Miller, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Midlantic Bank, N.A., successor to Continental Bank.

Claudia Z. Springer, Duane Morris & Heckscher, Philadelphia, PA, for Municipal Bonds Investors Ins. Co.

W. Jeffrey Garson, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, PA, for Allmed Financial Corp.

Joel H. Levitin, Dechert Price & Rhoads, Philadelphia, PA, for Creditors' Committee.

*OPINION*

DAVID A. SCHOLL, Chief Judge.

*A. INTRODUCTION*

The Plaintiffs in the instant proceeding have, in their post-trial briefing, narrowed the issue before us to whether this court should declare that accounts receivable generated by their home health care services performed on behalf of the Debtor hospital are not property of the Debtor's estate because they constitute the res of a constructive trust created by the Debtor in the Plaintiffs' favor. Since we find that the parties' relationship is that of debtor and creditor, and that neither the law, the parties' contract, nor the Debtor's conduct evinces wrongful acts or abuse of a confidential relationship necessary to create a constructive trust, we rule against the Plaintiffs.

*B. FACTUAL AND PROCEDURAL HISTORY*

The underlying Chapter 11 case of SACRED HEART HOSPITAL OF NORRISTOWN ("the Debtor") was filed on May 25, 1994, a week after the Debtor ceased its operations. This case has therefore been in a liquidation mode since its outset.

The Plaintiff has sought and been authorized to utilize cash collateral of its secured creditors, subject to their disputes regarding priority, in order to preserve its assets, including the hospital facility, for sale. We agree with the Plaintiffs that the cash collateral Orders entered on June 3, 1994, and thereafter have reserved whatever rights the Plaintiffs have in the Debtor's property. The main event in this case thus far has been the sale of the Debtor's hospital realty-asset to an unexpected bidder, Montgomery County, for a surprisingly high bid of $7.05 million. An attempt of the Borough of Norristown to thwart this sale by condemning the hospital was beaten back by an adversary proceeding (Adv. No. 94–0666DAS) in which the Borough's condemnation action was invalidated as violative of 11 U.S.C. § 362(a)(3).

After a status hearing of September 21, 1994, a deadline of November 22, 1994, was established for the Debtor to file a liquidating plan and a disclosure statement. A motion to extend this deadline to January 13, 1995, was recently allowed, due to the pendency of two adversary proceedings which will resolve the issues of the relative priorities of three creditor entities: (1) MIDLANTIC BANK, N.A., successor to Continental Bank ("the Bank"), the trustee of bonds issued on behalf of the Debtor, on which the balance due is approximately $25 million. The Debtor is seeking to avoid the Bank's liens as improperly perfected, and thus render the claims of the bondholders unsecured in a separate proceeding (Adv. No. 94–0561DAS) ("the Bank Proceeding"), tried on November 16, 1994, and on which briefing will be completed on December 16, 1994; (2) ALLMED FINANCIAL CORPORATION ("AllMed"), the purchaser of certain accounts receivable of the Debtor, which claims an apparently-undisputed replacement lien in certain property of the Debtor. AllMed will retain its complete secured status only if it can defeat alleged prior interests in the receivables in issue; and (3) SKILLED NURSING PROFESSIONAL SERVICES ("SNIPS"), a division of SKILLED NURSING HOME CARE, INC. ("SNHC"), and FACILITIES MANAGEMENT, INC. ("FMI," and with SNIPS, "the Plaintiffs"), which rendered home health care services on behalf of the Debtor prior to the closing of

the hospital. The Plaintiffs, in the instant proceeding ("the Proceeding"), seek a declaration that accounts receivables ("the Receivables") generated by the Debtor's home health care department are not property of the Debtor's estate, but rather are property of the Plaintiffs. This claim is based upon the Plaintiffs' further request for a declaration that the Debtor holds the Receivables in constructive trust for Plaintiffs. The Bank and AllMed have both intervened in the Proceeding as parties defendant because they believe that the Plaintiffs' success in the Proceeding would siphon off to the Plaintiffs an amount of about $450,000 in estate funds. The Debtor's total assets will be clearly inadequate to pay all of the Bank's claims, let along those of all of the Debtor's creditors. Therefore, this Proceeding is, in essence, a battle for distribution priorities among the Plaintiffs and the Bank, and to a lesser degree, AllMed.

The testimony at the trial of September 29, 1994, of Harry (Tad) McKeon, the Plaintiff's former contractor; Joseph J. McCann, McKeon's successor; Anthony J. Gatt, the Debtor's former Director of Finance; and Gatt's successor, Terrence J. Cunningham, established several pertinent facts. In order to better serve its patients, and to stem the tide of defections to other medical facilities by its former patients who required home health care services, the Debtor, in the late 1980's, decided to open its own home health care services department. Rather than create its own staff and department, the Debtor enlisted the services of SNHC and SNIPS, who are in the business of providing home health care services, and FMI, an SNHC-related entity which is in the business of operating and managing hospital home health care departments. At some unspecified time in 1989, the Debtor, through a wholly owned subsidiary, Hyde Park Health Service, Inc., formed a joint venture with SNHC in order to provide home health care services to its patients. This joint venture was known as Sacred Heart Home Care Services, Inc.

The costs of home health care services, like ordinary inpatient hospital services, may be reimbursed by Medicare only if the provider has an agreement with Medicare and a valid provider number. The Debtor allied itself with the Plaintiffs because, *inter alia*, the Plaintiffs already held a valid provider number, which enabled them to seek reimbursement from Medicare for the provision of home health services to eligible patients. Unfortunately for the joint venture, Medicare ultimately informed the parties that the Plaintiffs' provider number could not be used by any entity other than themselves, including the joint venture.

Although certain options were available to the Debtor by which the Plaintiffs, in their own right, could have provided the home health care services on behalf of the Debtor and appropriately sought reimbursement from Medicare themselves through the joint venture structure, the Debtor declined to pursue those options and dissolved the joint venture. Instead, the Debtor decided to secure its own provider number and operate its own home health care department. Under this arrangement, the Medicare regulations permitted the Debtor to subcontract out much of these services to the Plaintiffs, as long as certain requirements were satisfied, including the installation of one of the Debtor's own employees as head of its home health care department. No party has argued that the Medicare requirements, in this regard, were not met. Thus, on October 1, 1991, the Debtor entered into a contract with SNIPS for professional home health care services ("the Service Agreement"), and a separate contract with FMI to manage its home health care department ("the Management Agreement").

Revenues collected for home health care services from patients, insurance companies, and third party payors such as Medicare, the latter of which constituted the majority of the revenues received by the Debtor from its home health care operations, were, at that time, placed in an account maintained at PNC Bank ("the PNC Account"). The Debtor had exclusive control over the PNC Account. Under this arrangement, SNIPS would bill the Debtor monthly for the services it rendered to home health care patients and the Debtor would pay SNIPS from its general revenues. FMI's payment ar-

rangement was less clear. Although the Management Agreement suggests that, like SNIPS, FMI would submit monthly invoices to the Debtor and receive payment within 30 days (or thereafter with interest), the Agreement also details a reimbursement mechanism in which the PNC Account would be swept daily by the Debtor, a certain percentage of receipts would be paid to FMI, and a reconciliation between sums paid to FMI and the value of the services it rendered would be conducted by the parties at the end of the fiscal year. Apparently the sweep mechanism was never implemented, and FMI was paid in the same fashion as was SNIPS. In any event, the parties acknowledge that their arrangement obligated the Debtor to pay the Plaintiffs' invoices from whatever source of funds was available, not from just those generated by the home health service department. In other words, the Plaintiffs' right of payment was not contingent on the amount of the home care funds in the PNC Account or the collection of the Receivables.

After about a year of operations under the new arrangement, the Debtor fell substantially in arrears on its payment obligations to the Plaintiffs. In a letter to Gatt dated November 20, 1992, McKeon summarized over $500,000 in past due invoices and stated that "we entered into this relationship as strategic partners. Our goal was to assist Sacred Heart Hospital in increasing its bottom line through a profitable Home Health Agency.... In return for that we expected prompt payment for our services. We never expected that we would be put into the position of an unsecured creditor."

Rather than lose the services of the Plaintiffs, the Debtor cooperated with the Plaintiffs in an effort to structure an alternative arrangement which would assure the Plaintiffs prompt payment without running afoul of the Medicare regulations. By this time, the parties had explored the possibility of an outright assignment of the Receivables to the Plaintiffs. Because the Medicare law prohibits such assignments, however, the parties were forced to explore other avenues. *See* 42 U.S.C. § 1395g(c) ("No payment which may be made to a provider of services under this subchapter for any service furnished to an individual shall be made to any other person under an assignment or power of attorney....").

On December 17, 1992, the Plaintiffs, the Debtor, and CoreStates Bank, N.A. ("CoreStates"), entered into a letter agreement ("the Letter Agreement") which modified the parties' procedure for collecting the Receivables. In accordance with the Letter Agreement, a lock box for the Receivables was established at CoreStates, the Plaintiffs' bank ("the CoreStates Account"). The operative terms of the Letter Agreement were as follows:

> The [Debtor] hereby appoints FMI as its agent to act in its stead with regard to the [CoreStates Account] subject to the terms of the Management Agreement. Specifically, the [Debtor] hereby authorizes FMI to utilize the checks and other funds deposited into the [CoreStates Account] to pay, or to deposit into the accounts of (i) [SNIPS] pursuant to that certain Services Agreement by and between the [Debtor] and [SNIPS]; (ii) FMI pursuant to the Management Agreement; (iii) any other vendors of the [Debtor] as authorized pursuant to the terms of the Management Agreement; and (iv) the [Debtor] any remaining funds pursuant to the terms of the Management Agreement. FMI has exclusive authority pursuant to the Management Agreement to determine the amount of payment, time of payment, and all other matters regarding the use of the checks and other funds deposited in the [CoreStates Account] subject, of course, to the terms of the Management Agreement.

The stated purpose of the Letter Agreement was to "facilitate the collection of accounts receivable and the payment of accounts payable under the Management Agreement ...," although it is quite clear that the parties also intended, at the very least, to provide the Plaintiffs with greater assurance of receiving its payments due.

Once the CoreStates Account was in place, only the Plaintiffs accessed the home care funds in the Account. The Debtor never attempted to access the Account, nor did it attempt to divert the Receivables to any other account. When the Debtor wanted to know if the CoreStates Account contained

any surplus funds which it might use for its own purposes, it contacted the Plaintiffs and asked them. On those occasions when such inquiry was made, the Plaintiffs would first determine if their own invoices were current within 45 days, and would disburse any funds to the Debtor only if they were so current. Often, the Plaintiffs refused to disburse any funds to the Debtor at all.

As the Debtor's financial condition worsened, it sought, on occasion, advances from Medicare, and had to "pledge" outstanding Medicare receivables in support thereof. However, the Debtor never pledged the Receivables. Although the Debtor asserts that it did not need to do so, the Debtor gave no indication that any other Medicare receivables were likewise so exempt nor any explanation why the Receivables, as opposed to any other Medicare receivable belonging to the Debtor without restriction, were chosen for this special treatment.

At the time that the Debtor filed bankruptcy on May 25, 1994, the Plaintiffs were owed approximately $450,000, while the CoreStates Account contained less than $80.00. The CoreStates Account now contains over $30,000, apparently from proceeds remitted post-petition by third-party payors. There is approximately $380,000 in Receivables which have been billed to, but not yet received from, Medicare. There is approximately $34,000 more in Receivables yet to be billed to Medicare. The parties have stipulated that the Receivables are identifiable and traceable.

The Plaintiffs filed their Complaint on June 20, 1994, seeking declaratory relief that the Receivables were not property of the estate and were subject to a constructive trust in favor of SNIPS and FMI, and requesting that any such Receivables be immediately paid over to them by the Debtor. We conducted the trial on September 29, 1994. Both the Plaintiffs and the Debtor offered testimony and entered numerous documents into the record. By our Order dated September 30, 1994, the Plaintiffs were to file a post trial brief on or before October 13, 1994, and the Defendants were to file responsive briefs on or before October 27, 1994. Apparently due to their desire to give pre-trial briefing in the Bank Proceeding a priority, the Defendants requested an extension to file their briefs until November 7, 1994, on the condition that the Plaintiffs could file a reply brief by November 14, 1994. The court, although always reluctant to push back fixed deadlines, allowed these revisions to the briefing schedule. All briefs were filed in accordance with this schedule, and the Proceeding is now ready for determination.

## C. DISCUSSION

### 1. THE RECEIVABLES IN ISSUE ARE PROPERTY OF THE DEBTOR'S ESTATE EVEN IF THEY ARE SUBJECT TO A TRUST.

The Plaintiffs, despite recognizing the breadth of the term "property of the estate" as including "all legal or equitable interests of the debtor in property as of the commencement of the case ...," "wherever located and by whomever held ...," 11 U.S.C. §§ 541(a)(1), 541(a), begin from the premise that the outcome of this Proceeding depends on whether or not the Receivables are "property of the Debtor's estate." The Plaintiffs base their contention that property like the Receivables, purportedly held only in trust by the Debtor, is subject to the limitation of § 541(a) expressed in 11 U.S.C. § 541(d), which provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

Although § 541(d) was included in the Bankruptcy Code at the insistence of the secondary mortgage industry in order to protect such mortgagees from insolvent mortgage servicers, the section applies equally well to a situation where a debtor holds property in trust for another generally. Further development of the case law construing this section demonstrates that the § 541(d) exemption also applies to property held by a debtor in constructive trust for another. *See, e.g., In re Columbia Gas Systems, Inc.,* 997 F.2d 1039, 1059 (3d Cir.1993), *cert. denied,* ── U.S. ──, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994) ("Congress clearly intended the exclusion created by section 541(d) to include not only funds held in ex-

press trust, but also funds held in constructive trust...."). [1] *But see In re Omegas Group, Inc.*, 16 F.3d 1443, 1448–53 (6th Cir. 1994), discussed at pages 554–55 n. 7, 558 *infra.*

This court has repeatedly pointed out in the past that the emphasis on whether a trust res is "property of the estate" is usually misplaced. Although a debtor-settlor of a trust may, by reason of § 541(d), have no right to retain the trust res, nevertheless

> [t]he term "property of the estate," pursuant to 11 U.S.C. § 541(a)(1), embraces "all legal or equitable interests of the debtor in property as of the commencement of the case" and is therefore very broad in scope. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2312–14, 76 L.Ed.2d 515 (1983). *See also, e.g., In re Temp–Way Corp.*, 80 B.R. 699, 702 (Bankr. E.D.Pa.1987); *In re Ford*, 78 B.R. 729, 735 (Bankr.E.D.Pa.1987); and *In re Mason*, 69 B.R. 876, 882–84 (Bankr.E.D.Pa.1987). The Debtor, as the settlor of the trust in issue, certainly has *some* legal or equitable interest in the [trust res] as of the commencement of the case.

*In re CS Associates*, 121 B.R. 942, 960 (Bankr.E.D.Pa.1990). *See also In re Summit Airlines, Inc.*, 94 B.R. 367, 370 (Bankr. E.D.Pa.1988), *aff'd*, 102 B.R. 32 (E.D.Pa. 1989); and *Temp–Way, supra*, 80 B.R. at 702 (although third parties were entitled to possession of the funds in issue in these cases, the interests of the debtors in the funds in issue were found to be within the broad scope of property of the respective debtors' estates).

■ We therefore conclude that the Debtor clearly has a sufficient interest in the Receivables to render them property of the Debtor's estate. However, this conclusion would not preclude us from deciding that the Plaintiffs were entitled to their sought-for relief of imposition of a constructive trust upon the Receivables and our conclusion that, as the res of the trust, the Plaintiffs had first priority to them. Thus, whether the Plaintiffs "own" the Receivables or whether they are "merely" held by the Debtor in trust for the Plaintiffs, the end result is the same; neither the Debtor nor its estate would hold any equitable interest in the Receivables, and, therefore, the Receivables would be available, unshared, to the Plaintiffs if we found the requested constructive trust to arise. It is therefore impossible not to recognize a trust determination as a decision relating to distribution of the often-scarce assets of a debtor's estate. *But cf. Columbia Gas, supra*, 997 F.2d at 1058 n. 6, 1059 ("[I]f [the debtor] holds the customer refunds in [constructive] trust, ... these refunds are excluded from [the debtor's] bankruptcy estate and are immediately payable to its customers."). [2]

2. *THE PLAINTIFFS' LOSING ARGUMENT THAT CERTAIN LANGUAGE OF THE LETTER AGREEMENT SUPPORTS THEIR CASE WOULD BE RELEVANT TO AN EXPRESS TRUST OR PAROL TRUST THEORY, BUT NOT TO THE CONSTRUCTIVE TRUST THEORY ON WHICH THEY ARE FORCED TO ULTIMATELY RELY.*

■ In their reply brief, the Plaintiffs emphasize two points, which we ultimately con-

---

1. Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed. H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978); U.S.Code Cong. & Admin.News 5787, 5868, 6324. Although there is no doubt that Congress has expressed an intention that

§ 541(d) applies to constructive trusts in this passage, it is not so clear that the above example chosen by Congress is indeed an example of when the imposition of a constructive trust would be appropriate. *See, e.g., In re Wheeling*, 68 B.R. 388, 390 (Bankr.W.D.Pa.1986); *In re Moskowitz*, 13 B.R. 357, 360 (Bankr.S.D.N.Y. 1981). *Cf. In re Rowland*, 140 B.R. 206, 209–10 (Bankr.S.D.Ohio 1992).

2. We would classify this passage as dictum, since it has no effect on the outcome of that case. We find this passage misleading, since it attempts to artificially de-emphasize the significance of a finding that a trust exists on the priority of distribution in bankruptcy.

clude are both factually and legally weak. First, they re-assert that the final paragraph of the Letter Agreement, which was subject to CoreStates' assent only ("the Final Paragraph") and reads as follows, effects a transfer of ownership to them of all of the Receivables paid into the CoreStates Account:

> The undersigned [i.e. CoreStates] hereby accepts and agrees to act as agent for the exclusive benefit of FMI and to comply with the foregoing authorizations. By the acceptance of the undersigned hereof, the undersigned agrees: (i) to act as agent for, and under the exclusive direction of, FMI with respect to the above-described funds; and (ii) the net payments made to the [CoreStates Account] are the sole and exclusive property of FMI and FMI's interest therein is superior to any interest that the undersigned may have or claim with respect thereto.

Despite the vigor of the Plaintiffs' argument, most recently a contention that another interpretation would frustrate the meaning of the Letter Agreement as an entire contract, it is clear to us that the "undersigned" referred to in the Final Paragraph is CoreStates, not the Debtor. Contrary to the Plaintiffs' argument, we find that this reference is quite clear from the organization of the Letter Agreement itself. The signatures of the Debtor's and the Plaintiffs' representatives *precede* the Final Paragraph, and only the signature of CoreStates' representative follows. Based on this sequence, it is quite clear to us that the Final Paragraph was meant to effect a waiver of CoreStates' right of setoff against any funds contained in the CoreStates Account vis-à-vis the Plaintiffs. The Final Paragraph was also clearly intended to remove all doubt as to who had authority to direct CoreStates with regard to the CoreStates Account. Thus, the Final Paragraph is not meaningless even if applied only to CoreStates.

We do not believe, given the placement of the signatures in the Letter Agreement, that the Final Paragraph was meant to affect the ownership rights of Debtor and the Plaintiffs in the Receivables *inter se*. A fair reading of the entire Letter Agreement leads us to the conclusion that the Management Agreement was meant to control that relationship. Contrary to Plaintiffs' contract arguments, our interpretation of the Final Paragraph is the only one which gives meaning to the Final Paragraph while remaining internally consistent with the organization and text of the remainder of the document.

We note further that our conclusion that at least the legal title of the funds deposited into the CoreStates Account remains with the Debtor is consistent with the fact that the account was opened in the Debtor's name; the Account agreement recognizes FMI as the Debtor's agent, and was signed by the Debtor; the Debtor's taxpayer identification number was used to open the Account; and, most importantly, the checks and other forms of payment deposited into the Account were made payable to the Debtor.

■ The Plaintiffs attempt to respond to these facts by arguing that the home care funds are indeed paid to (and presumably were the property of) the Debtor when issued by Medicare and other payors, but that they became the property of the Plaintiffs once they were deposited into the CoreStates Account. At first blush, it appears that the Plaintiffs are suggesting that the Letter Agreement constitutes an assignment of future Receivables. Certainly the Plaintiffs' description of the effect of the Letter Agreement in this regard sounds very much like an assignment. Because the parties assume that such an assignment would violate Medicare law, however, the Plaintiffs are careful to avoid that characterization of their argument.

Of course, it is possible that the Debtor could have transferred each payment to the Plaintiffs once that payment was deposited into the CoreStates Account, but it is clear from the evidence presented at trial that Debtor did not take *any* action with regard to the funds on a day-to-day basis or otherwise. We are therefore at a loss then to explain how the funds could automatically be said to have switched owners once they were deposited into the CoreStates Account. We therefore conclude that the funds did not become the property of the Plaintiffs simply by being deposited into the CoreStates Account. *See First Security Bank of Utah,*

*N.A. v. Gillman,* 158 B.R. 498, 505–07 (D.Utah 1993) (property which the debtor holds as a trustee is property of the estate; and also, the contractual agreement in issue was found not to create a trust agreement).[3]

■ Moreover, it appears to this court that arguments based upon the language of the Letter Agreement and other objective manifestations of a "trust-like" relationship between the Debtor and the Plaintiffs would tend to support an express trust or parol trust relationship, not the constructive trust theory pleaded in the Complaint and re-emphasized by the Plaintiffs in their reply brief. This leads to the second point emphasized by the Plaintiffs in their reply brief, *i.e.,* that they are relying on the theory that the Receivables are solely their property and on a constructive trust theory as pleaded in their Complaint, and not at all on any express trust theory. This argument was somewhat surprising to not only the Defendants, who argued against an express trust theory because they understood the Plaintiffs to rely, at least alternatively, on this theory, but to this court as well.

■ The Plaintiffs' testimony at trial and briefs were and are, respectively, peppered

with assertions that the parties *intended* to create a trust-like relationship to avoid a simple debtor/creditor relationship, and that the Receivables, therefore, should be reserved for the Plaintiffs' benefit alone. As we discuss more completely at pages 554–56 *infra,* however, the parties' intent is largely irrelevant to the creation of a constructive trust, which is nothing more than an imposition of an equitable remedy.[4]

The parties' intent and the Plaintiffs' assertions and evidence of a trust-like relationship between the parties are indeed more relevant to an express trust inquiry. While it is quite clear that the Plaintiffs are not asserting the existence of an express, *written* trust, their factual assertions suggest that the parties may have created a parol trust.

■ A parol trust is an express trust where the parties' intent to create the trust relationship is evidenced by spoken word or conduct, not a writing.[5] Parol trusts are not favored, *see Brunier v. Stanert,* 369 Pa. 178, 183, 85 A.2d 130, 133 (1952), and equity will not lend in their creation, although they will be enforced if properly created without the aid of the court. *Van Sciver v. Rothesies,* 36

---

**3.** The *First Security Bank* court also refused to impose a constructive trust on the funds in issue. *Id.* at 507–08.

**4.** The Plaintiffs' confusion on this point is not uncommon, and all too often shared by the courts as well. *See, e.g., Yonkers Board of Education v. Richmond Children's Center, Inc.,* 58 B.R. 980, 982–83 (S.D.N.Y.1986) (court imposes a constructive trust relying, in part, on the presence of factors which are typically used to establish a traditional trust). When a court's inquiry focuses on such questions as intent, the segregation of the trust res, the existence of a certain beneficiary, and the putative trustee's access to and control of the res, the court should be testing theories of express or resulting trust. For a fine example of proper trust analysis, see *In re Goldstein,* 135 B.R. 703 (Bankr.S.D.Fla.1992) (resulting trusts). The presence of such factors are not a prerequisite of, and indeed are irrelevant to, the imposition of a constructive trust.

**5.** The Plaintiffs' description of the parties' relationship also sounds very much like a resulting trust, which "is founded on a presumption of the intent of the parties arising from and shown by their acts at the time of the transaction in question." 38 P.L.E., Trusts, § 71, at 594 (1961). Indeed, it is difficult to differentiate this defini-

tion of a resulting trust from an express trust established by conduct. The major distinction, and the reason that a resulting trust does not arise from the facts of this case, is the specific factual scenario which gives rise to a resulting trust:

> A resulting trust arises where a person causes property to be transferred under circumstances raising an inference that he does not intend that the transferee shall have the beneficial interest therein. Since the person holding the property is not entitled to the beneficial interest, and the beneficial interest is not otherwise disposed of, it springs back or results to the person who made the disposition, or to his estate, so that the person holding the property holds it upon a resulting trust for him or his estate.

*Id.* at 594–95 (footnotes omitted). Of course, in this case, the Plaintiffs did not transfer the Receivables to the Debtor, from which we might infer, based on the parties' conduct and relationship, that they were meant to be held by the Debtor in trust for the Plaintiffs. Instead, the Receivables were paid directly to the Debtor from third parties. Thus, the resulting trust theory does not apply. *See Truver v. Kennedy,* 425 Pa. 294, 305 n. 3, 229 A.2d 468, 473 n. 3 (1967), and case cited therein.

F.Supp. 577, 579 (E.D.Pa.), *aff'd,* 122 F.2d 697 (3d Cir.1941). Like any express trust, the pivotal element is proof of the parties' intent to create a trust relationship. *See generally In re Kulzer Roofing, Inc.,* 139 B.R. 132, 139–40 (Bankr.E.D.Pa.), *aff'd,* 150 B.R. 134 (E.D.Pa.1992), and cases cited therein. *See also* 38 P.L.E., *supra,* § 25, at 495–96. All elements of a parol trust must be proved by clear and precise evidence, and none may be left to inference. *Id.,* §§ 19, 25, 42, at 482, 502, 532. *See also In re Shervin,* 112 B.R. 724, 733–34 (Bankr.E.D.Pa.1990); *In re Manzo,* 106 B.R. 69, 71 (Bankr.E.D.Pa. 1989); and 38 P.L.E., *supra,* § 25, at 498, 503.

Apart from the fact that the Plaintiffs apparently agree by not pressing this argument, we find no express or parol trust here. Given the Plaintiffs' desire for greater security in their dealings with the Debtor, it is not surprising that the Plaintiffs can indeed point to certain indicia suggesting an intent to create a trust relationship. For example, the Plaintiffs objected to being treated as an "unsecured creditor," and demanded an alternative relationship with the Debtor and Debtor responded.[6] Moreover, the Receivables were billed to Medicare under a separate provider number and are easily identifiable. Similarly, the home care funds were maintained in a segregated account and were never commingled with other funds. The Plaintiffs were the only party to exert control over the Receivables. The Debtor did not attempt to use the Receivables for its own purposes, or otherwise meddle with them. Debtor did not use the Receivables to support its request for an advance from Medicare, nor did the Debtor attempt to liquidate the Receivables post-petition, although it did liquidate all of its other accounts receivable. All of these facts support an argument that

the Receivables were intended to be held in trust for Plaintiffs' benefit.

On the other hand, whether due to the requirements of the Medicare law or otherwise, there are also several facts which contradict the notion that a trust existed between the parties. *See* 38 P.L.E., *supra,* § 44 at 538 ("Circumstances which are patently inconsistent with the existence of a trust will refute separate evidence clearly indicating the existence of the trust."). Although never exercised, the Debtor did have access to the CoreStates Account and maintained a decision-making authority over the collection and disposition of the Receivables. The Debtor had a financial interest in the home care funds remaining after other expenses were met. In all of the operative documents, the Plaintiffs' role is described as that of agent or subcontractor, suggesting a simple debtor/creditor relationship. Likewise, all services of the home health care department were provided in the name of the Debtor, and payment for such services was directed to the Debtor. *Cf. In re Taylor & Campaigne, Inc.,* 157 B.R. 493, 495 (M.D.Fla. 1993) (real estate commissions paid directly to debtor constituted property of the estate; real estate sales agent was only general unsecured creditor). The Plaintiffs had no direct right of payment from the home health care patients. Indeed, in a letter dated April 19, 1993, to Gatt, McKeon referred to the Receivables as "Sacred Heart receivables." The Debtor was unconditionally obligated to pay the Plaintiffs' invoices from whatever source of funds was available, not just from the Receivables. *Cf. Shervin,* 112 B.R. at 734 (because the debtor could pay the plaintiff "from whatever source he chose," no specific source of funds constituted a trust res). The stated purpose of the Letter

---

**6.** Although the Plaintiffs make a great deal of McKeon's November 20, 1992, letter expressing their desire not to be placed in the position of an unsecured creditor, *see* page 548 *supra,* we are not at all convinced that such a unilateral assertion means very much, not even, if taken on its own terms, that the Plaintiffs were using the term "unsecured creditor" in its technical, bankruptcy sense. For example, just one sentence earlier, the Plaintiffs inform the Debtor that they expected prompt payment of their services, thus

creating the inference that they believed that they were being put in the place of an unsecured creditor simply because they had not been receiving prompt payment of their invoices. In fact, the Plaintiffs are unsecured creditors because they performed their services and billed the Debtor afterward without first demanding a security interest in collateral. The status had nothing to do with the promptness of the Debtor's payments. It thus seems to us that McKeon meant "past due creditor" when he wrote "unsecured creditor."

Agreement as to facilitate the collection of the Home Care Receivables also belies the notion that the parties intended to enter a trust relationship. Finally, the Debtor's explanation that it did not access or use the home care funds because its health home care department was an important part of its operations and it did not want to violate the Letter Agreement or lose the services of the Plaintiffs is plausible.

On balance, we conclude that the Debtor was attempting to keep the Plaintiffs happy by arranging to keep their invoices more or less current, but it did not intend to relinquish all beneficial interest in the Receivables and hold them in trust for the Plaintiffs. Our conclusion is consistent with the parties' pre-petition predicament. It appears to us that both parties believed that the creation of an express trust, with Medicare receivables as the res, would have run afoul of the anti-assignment provision of Medicare law. The parties were clearly struggling to devise some method of "securing" the Debtor's obligation to the Plaintiffs without violating Medicare law. Although we do not think they improperly attempted to circumvent Medicare law, their solution was necessarily

imperfect from the Plaintiffs' perspective. It certainly did not establish a traditional trust. It merely happens that the compromise chosen by the parties pre-petition has not served the Plaintiffs well now that the Debtor has filed bankruptcy.

3. *THE PLAINTIFFS HAVE NOT SHOWN THAT THEY ARE ENTITLED TO THE IMPOSITION OF A CONSTRUCTIVE TRUST UPON THE RECEIVABLES.*

 Since this court has rejected the argument that the Plaintiffs are the sole owners of the Receivables, the constructive trust theory, and we must therefore consider their arguments and the pertinent authorities on this theory at length. The imposition of a constructive trust is governed by applicable state law, which is, in this case, Pennsylvania law. *See City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 94–97 (3d Cir.1994); *Goldberg v. New Jersey Lawyers' Fund*, 932 F.2d 273, 280 (3d Cir.1991); *In re McKay*, 110 B.R. 764, 770 (Bankr.W.D.Pa.1990); and *In re American Int'l Airways, Inc.*, 44 B.R. 143, 146 (Bankr.E.D.Pa.1984). *But see Omegas Group, supra*, 16 F.3d at 1448–52.[7] As

---

7. In *Omegas Group*, the court reasons that constructive trusts are remedies which only come into being "by the grace of judicial action." *Id.* at 1449. Thus, the *Omegas Group* court concludes, a trustee's strong arm powers will defeat any attempts to impose a constructive trust after a petition has been filed. *Id.* at 1453. *Cf. Gillman, supra*, 158 B.R. at 506–07; and *In re Naydan*, 162 B.R. 204, 206 n. 2 (Bankr.W.D.Ark. 1993) (both courts recognizing the pre-post-petition issue without resolving it). The *Omegas Group* court seems to announce a federal rule of general applicability prohibiting a bankruptcy court from ever imposing a constructive trust under applicable state law post-petition.

Although we agree with that court's analysis of the equities involved when constructive trusts are recognized, and we observe the wisdom of its desire to formulate a bright-line rule of reason in an area where logical inconsistencies often abound, we are not able to adopt the *Omegas Group* court's resolution of the conflict between the trustee's strong arm powers and § 541(d) of the Code for several reasons. First, the legislative history of § 541(d), quoted at page 550 n. 1 *supra*, makes it clear that Congress intended the § 541(d) exclusion to apply to at least some constructive trusts. Nothing in the actual language of § 541(d) contradicts that legislative history. Second, the Third Circuit Court of Appeals has recently and repeatedly held that we must apply

applicable state law when addressing the constructive trust issue under § 541(d) unless a specific federal concern dictates otherwise. *See Sharon Steel, supra*, 41 F.3d at 94–96 ("[W]e look to state law to determine whether the claimant has shown a trust relationship."); *In re Nejberger*, 934 F.2d 1300, 1302 (3d Cir.1991) ("Although section 541 defines property of the estate, we must look to state law to determine if a property right exists and to stake out its dimensions."); and *Goldberg*, 932 F.2d at 280 (same). *Compare Columbia Gas, supra*, 997 F.2d at 1055 (whether customer refunds are held in trust by a utility pursuant to a federal statute "implicates important federal interests to warrant the application of federal common law."). *But see id.* at 1056 (in dicta, the *Columbia Gas* court, like the *Omegas Group* court, indicates that the state law on constructive trusts may have to be "displaced," but only because state law may *limit* the applicability of § 541(d) beyond what Congress intended as evidenced by the legislative history. Third, Pennsylvania case law suggests that a constructive trust arises as soon as the putative trustee acquires the property in question subject to an equitable duty to convey it to another, not when the constructive trust is subsequently recognized by the court. *See, e.g., Gray v. Leibert*, 357 Pa. 130, 135, 53 A.2d 132, 135 (1947). *See also In re Joseph B. Dahlkemper Co., Inc.*, 165 B.R. 149,

noted above, a constructive trust is not a trust at all, but, rather, under Pennsylvania law, an equitable remedy designed to prevent unjust enrichment. *See e.g., Yohe v. Yohe,* 466 Pa. 405, 411, 353 A.2d 417, 420 (1976); *Gray, supra,* 357 Pa. at 135, 53 A.2d at 135; and *Gee v. Eberle,* 279 Pa.Super. 101, 112, 420 A.2d 1050, 1056 (1980). A constructive trust does not depend upon the intentions of the parties. *Gray, supra,* 357 Pa. at 135, 53 A.2d at 135; and *Gee, supra,* 279 Pa.Super. at 112, 420 A.2d at 1056. Rather, a constructive trust arises when a party holds property subject to an equitable duty to convey it to another.[8] *Yohe, supra,* 466 Pa. at 411, 353 A.2d at 421; *Truver, supra,* 425 Pa. at 305, 229 A.2d at 474; and *Gray, supra,* 357 Pa. at 135, 53 A.2d at 135. This equitable duty arises only in the presence of fraud, duress, undue influence, mistake, or abuse of a confidential relationship. *Yohe, supra,* 466 Pa. at 12, 353 A.2d at 421.

■ The types of "confidential relationships" which are typically the subject of constructive trusts include the relationship between a fiduciary and those who place their trust in him, such as family members, the incompetent, and the elderly. In Pennsylvania, the question of whether a particular relationship is confidential is one of "fact and arises when one party places confidence in another with a resulting superiority of influence on the other side." *Yohe, supra,* 466 Pa. at 412, 353 A.2d at 421; and *Truver, supra,* 425 Pa. at 305–06 & n. 4, 229 A.2d at 474 & n. 4.

■ The relationship between debtor and creditor business entities rarely rises to the level of a confidential relationship. *See, e.g., Rea v. Ford Motor Co.,* 326 F.Supp. 627, 634 (W.D.Pa.1971) ("These parties were a dealer and a manufacturer. There was not necessarily any confidential relationship between the two. If plaintiffs wished to protect themselves, they should have insisted upon some agreement or memorandum in writing signed by [the manufacturer] showing that [the manufacturer] was acquiring title for the benefit of the plaintiffs, but no such document exists."); and *Harrison v. Welsh,* 295 Pa. 501, 508, 145 A. 507, 509 (1929) (confidential relationship did not exist between two experienced securities dealers where the plaintiff "had ample opportunity to secure such data as was necessary and desired ..." to protect himself).

■ The Plaintiffs bear the burden of establishing a constructive trust by evidence which is clear, precise, and unambiguous. *See* 38 P.L.E., *supra,* § 111, at 636. *See also Taylor & Campaigne, supra,* 157 B.R. at 494; *McKay, supra,* 110 B.R. at 770; and *American Int'l Airways, supra,* 44 B.R. at 146. Indeed, they must overcome the presumption that runs in favor of the Debtor, the legal title holder, that the Receivables belong to the Debtor and are properly included in its estate. *See McKay, supra,* 110 B.R. at 770; and *Metzger v. Metzger,* 338 Pa. 564, 568, 14 A.2d 285, 287 (1940).

■ The Plaintiffs argue that a showing of wrongdoing or breach of a confidential relationship is not a prerequisite to a constructive trust if its imposition will prevent unjust enrichment. While this may be so when a debtor obtains the property in question as a result of a mistake or an accident, no mistake or accident is alleged here. Despite the Plaintiffs' contentions, we must be

---

155 (Bankr.W.D.Pa.1994) ("Where a *debtor's conduct has given rise to a constructive trust* so that debtor holds only bare legal title to the property but has a duty to convey it to the rightful owner, the bankruptcy estate generally is subject to the same duty.") (emphasis added).

8. The property which allegedly constitutes the res of a constructive trust must be identifiable. *See City of Philadelphia v. Mancini,* 431 Pa. 355, 359–60, 246 A.2d 320, 323 (1968). *See also* 1 DOBBS, LAW OF REMEDIES 2d, § 4.3(2), at 591 (1993). We agree with Plaintiffs that identifiable accounts receivable may serve as the res of

a trust. *Accord Mancini, supra,* 431 Pa. at 363, 246 A.2d at 324 ("[T]he accounts receivable which Mancini held ... would be the proper subject of a constructive trust in favor of the City."). *Cf. In re Pratt & Whitney Co.,* 140 B.R. 327, 330 (Bankr.D.Conn.1992) (plaintiff seeks to impose a constructive trust on a receivable). Of course, the fact that certain property is segregated and identifiable does not alone establish either a traditional or a constructive trust. *See, e.g., In re William H. Vaughan & Co.,* 63 B.R. 438, 439 (E.D.Pa.1986); and *Snyder v. First Nat'l Bank of Pen Argyl,* 59 D. & C.2d 187, 192 (Northampton Co. C.P.1973).

careful not to improperly split unjust enrichment from its equitable underpinnings. In other words, we must not be quick to impose a constructive trust unless the circumstances of the matter before us evoke the court's equity and demand a remedy, *e.g.*, a case of a defendant who has profited by its wrongdoing or breach of a confidential relationship. It is this wrongdoing or breach of confidential relationship which gives rise to the "equitable duty" to transfer the property in question to the party which equity seeks to protect.

Without this equitable predicate, every bankruptcy debtor would be unjustly enriched and every unsecured creditor would be entitled to a constructive trust. Clearly this proposition is untenable. *See, e.g., McKey v. Paradise*, 299 U.S. 119, 122, 57 S.Ct. 124, 125, 81 L.Ed. 75 (1936) ("The bankrupt was a debtor which had failed to pay its debt. We know of no principle upon which that failure can be treated as a conversion of property held in trust."); *Gillman, supra*, 158 B.R. at 507–08 (the estate is not unjustly enriched when a creditor, like other similarly situated creditors, is forced to receive less than full payment in light of the "congressional policy choice incorporated into the Bankruptcy Code ..." favoring this end); *Morris v. Philadelphia Electric Co.*, 45 B.R. 350, 353 (E.D.Pa.1984) ("In a bankruptcy proceeding a constructive trust will not be declared simply because a debtor is avoiding part of his obligations to his creditors. That is a necessary outcome of all successful bankruptcy proceedings."); *Rowland, supra*, 140 B.R. at 209 ("Generally, a mere breach of contract is insufficient to raise a constructive trust."); *Kulzer Roofing, supra*, 139 B.R. at 140 ("A relationship which is purportedly a trust relationship may, in fact, be merely a debtor-creditor relationship."); *Shervin, supra*, 112 B.R. at 734 ("A trust must be distinguished from a debt, which arises when one incurs merely an obligation to pay a certain sum of money."); and *Mancini, supra*, 431 Pa. at 362, 246 A.2d at 323 ("It would be impossible to state all the circumstances in which equity will fasten a constructive trust upon property ... [b]ut the mere failure to pay a debt does not belong in that category."). Therefore, in order for the Plaintiffs to successfully evoke the equity of this court on the basis of a constructive trust, they must show that the Debtor holds the Receivables as a result of its own wrongdoing or breach of a confidential relationship.

There has been no allegation of wrongdoing on the part of the Debtor. Moreover, there was little friction or personal animosity between the parties at any time. Therefore, we must determine if a confidential relationship existed between Plaintiffs and Debtor, and if so, whether the Debtor profited by breaching that relationship. Certainly, the Plaintiffs' relationship with the Debtor does not fit neatly into any of the typical non-business examples of a "confidential relationship." Rather, these parties are nothing more than corporate entities that amicably conducted business on equal footing. If anything, the Plaintiffs apparently held the superior bargaining position at the time of execution of the written Agreements. The facts are not, in our view, comparable to those involved in *In re Visiting Nurse Ass'n of W. Pa.*, 143 B.R. 633, 638–39 (W.D.Pa.1992), *aff'd*, 986 F.2d 1410 (3d Cir.1993), where the Court found a "confidential relationship" necessary to support a constructive trust because Medicare law created a duty on the part of a provider to accurately request periodic interim advance payments from the federal government, creating a trust fund in the advance payments received.

The Plaintiffs argue, however, that the Debtor's intent and efforts to ensure payment of Plaintiffs' invoices notwithstanding the Debtor's own questionable financial fortunes created a relationship that went beyond a simple debtor/creditor relationship. They contend that they agreed to continue providing services to the Debtor only in reliance on these prophylactic measures. This argument is not without some appeal. In the end, however, it fails to carry the day.

We believe that the case in which a creditor makes an argument most similar to the argument made by the Plaintiffs here was in *Pratt & Whitney, supra*, 140 B.R. at 328. There, the debtor, a machine manufacturer, entered an agreement with a foreign machine manufacturer to jointly manufacture and sell,

in the United States, the foreign company's product. *Id.* In order to help the fledgling endeavor along, the foreign company sent some of its own employees to work at the debtor's plant, and together they marketed the foreign company's product. *Id.* As a result of these efforts, a customer was found who wished to purchase two very large and expensive machines. *Id.* Despite the parties' joint efforts in securing this customer, only the debtor entered into the equipment purchase agreement with the customer ("the Purchase Agreement"). *Id.* The debtor, in turn, entered a sales agreement with the foreign company for the machines ("the Sales Agreement"). *Id.* The Sales Agreement was designed to work in tandem with the Purchase Agreement. As the customer made payments to the debtor under the Purchase Agreement, the debtor was obligated under the Sales Agreement to make an installment payment to the foreign company equal to a percentage of the customer payment. *Id.* In this way, the foreign corporation had the added assurance of knowing that its installment payments would come due only when debtor would have sufficient cash flow.

Not long after the first few installments were paid under the Purchase and Sales Agreements, the debtor entered into a refinancing agreement with its lender. *Id.* at 329. Therein, the debtor pledged its accounts receivable to the lender in order to secure the loan. *Id.* The foreign company was not aware of the refinancing arrangement. *Id.*

Despite the Purchase Agreement and the new refinancing, the debtor's financial condition worsened, preventing it from making an installment under the Sales Agreement despite the fact that the customer had paid its installment under the Purchase Agreement. *Id.* The foreign company, knowing that the customer had made its payment, demanded to know why the installment under the Sales Agreement was missed, and was told by the debtor that the installment would be made up as soon as certain other, non-related collections were made. *Id.* Not surprisingly, the foreign corporation was not satisfied with the debtor's explanation: "We understand

that payment from [the customer] for this part of the contract has been received . . . , so why don't you pay us?" *Id.* The debtor finally made a partial payment of the missed installment, but then missed another installment and filed bankruptcy shortly thereafter. *Id.* The foreign company filed a complaint against the debtor seeking a declaratory judgment that the final installment owed by the customer was not property of the debtor's estate, or in the alternative, requesting the imposition of a constructive trust on the receivable. *Id.* at 330. The customer paid its final installment to the trustee pending final determination of the foreign company's suit. *Id.*

First, the foreign company argued that it had a joint venture or principal/agent relationship with the debtor which created fiduciary responsibilities on the part of debtor. *Id.* The court agreed that the parties had a joint venture, but noted that "[t]his conclusion . . . goes but a short way towards determining the dispositive issue of [plaintiff's] entitlement to the imposition of a constructive trust on the . . . receivable. This is because . . . the presence or absence of a fiduciary relationship is not conclusive on the right to invoke the constructive trust doctrine." *Id.* at 330–31. Then, after reviewing the law of constructive trusts and relevant case law, the court concluded that

[u]nder the facts of this proceeding, . . . no valid basis exists to impose a constructive trust on the . . . receivable *in favor of* [the plaintiff]. The debtor has committed no wrongdoing outside of not paying [the plaintiff]. I find that the debtor and [the plaintiff] intended *that complete, not bare, title* to the . . . receivable was to be in the name of the debtor. The parties contracted that the debtor's obligation to pay [the plaintiff's] invoices to it *was independent of* the debtor's receipt of funds from [the customer]. . . . In terms of the Connecticut phrasing of the constructive trust doctrine, the debtor breached no fiduciary duty, committed no fraud and did not obtain title to the . . . receivable through unconscionable conduct or the violation of any duty owed to [the plaintiff]. [T]he imposition of a constructive trust should not be used to relieve [the plaintiff] of a

conscious business judgment it made in handling its affairs with the debtor.

*Id.* at 332–33.

The parallels between the facts of the *Pratt & Whitney* case and the one before us are striking. The Debtor and the Plaintiffs were engaged in a cooperative business venture, like the debtor and the foreign company in *Pratt & Whitney.* Likewise, payments from Medicare, like the payments from the customer in *Pratt & Whitney,* were owed to the Debtor only. The obligations owed to both the Plaintiffs and the foreign company were independent from the collection of the receivables in question. Both the Plaintiffs and the foreign company involved in *Pratt & Whitney* requested the court to impose a constructive trust on receivables. And, like the finance company in *Pratt & Whitney,* AllMed and the Bank assert that they subsequently secured an interest in the Receivables and will be harmed if a constructive trust is imposed.

■ The parallels do not end with the similarity of the respective factual settings of these matters, however. We think the *Pratt & Whitney* court's conclusion is equally applicable to the case at bar. The Plaintiffs affirmatively, and with clear reason and with leverage to structure the transaction as they wished, dictated the form and structure of its business relationship with the Debtor. That relationship did not include security,[9] guarantees, or assignments. Whether due to the Medicare law or not, the Plaintiffs were unable to rise above the status of an unsecured creditor for the sums owing to it. Potential losses were a risk of doing business with the Debtor which they knowingly accepted. Like the court in *Pratt & Whitney,* we will not impose a constructive trust in order to "relieve [the Plaintiffs] of a conscious business judgment it made in handling its affairs with [the [D]ebtor]."

■ As several other cases refusing to find constructive trusts present have recognized, there is always a strong argument contrary to any equities which the creditor-

"beneficiary" of a trust can muster which can be made by other creditors whose distributions will be adversely affected if a trust is imposed. Most notable among these is *Omegas Group, supra,* 16 F.3d 1443, 1451–53 & n. 9, which states as follows:

> "[A] constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code." *The Oxford Organisation, Ltd. v. Peterson (In re Stotler and Co.),* 144 B.R. 385, 388 (1992).

. . . . .

> The equities of bankruptcy are not the equities of common law. Constructive trusts are anathema to the equities of bankruptcy because they take from the estate, and thus directly from competing creditors, not from the offending debtor.... The Code recognizes that each creditor has suffered disappointed expectations at the hands of the debtor; for this reason, it makes maximization of the estate the primary concern and entitlement to shares of the estate secondary. Imposing a constructive trust on the debtor's estate impermissibly subordinates this primary concern to a single claim of entitlement.

. . . . .

> [C]onstructive trusts therefore have no place in bankruptcy.

(most citations and footnotes omitted). Although the *Omegas Group* Court goes further than we are able or prepared to go at this time, *see* pages 554–55 n. 7 *supra,* nonetheless, like that court, "we are not inclined to allow creditors to utilize a trust theory as a means of obtaining preferential treatment in bankruptcy." *In re Temp–Way Corp.,* 82 B.R. 747, 753 (Bankr.E.D.Pa.1988). *See also Kulzer Roofing,* 139 B.R. at 138, and cases cited therein. *Accord, e.g., In re Haber Oil Co., Inc.,* 12 F.3d 426, 436 (5th Cir.1994); *First Security Bank, supra,* 158 B.R. at 507–08; *In re Bailey Pontiac, Inc.,* 139 B.R. 629, 635 (N.D.Tex.1992); *Naydan, supra,* 162 B.R. at 206; and *Rowland, supra,* 140 B.R. at 209.

---

9. Interestingly, the Plaintiffs disagree with the Debtor's contention that the Medicare law also prohibits a provider from encumbering its Medicare receivables with a lien. If this is so (and we need not decide the question), we do not understand why the Plaintiffs opted not to take a security interest in the Receivables in favor of the far less certain arrangement it chose.

While there have been some inroads into strict application of the equitable distribution concept by alleged trust-beneficiary creditors, these have occurred only in situations where a governmental entity was successfully claiming a statutory trust on its own behalf, *see Sharon Steel, supra,* 41 F.3d at 101, n. 9 (the Court of Appeals notes that the law announced in our *Kulzer Roofing* case is "readily distinguishable as it did not involve a taxing authority," thus suggesting that constructive trust standards differ when a governmental body and/or a federal statutory scheme is involved as opposed to those calling for a straightforward application of the common law); and *Visiting Nurse Ass'n, supra,* and in situations where the debtor is found to be a mere conduit for proceeds payable to another. *See Columbia Gas,* 997 F.2d at 1059; *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enterprises, Inc.,* 960 F.2d 366 (3d Cir.1992); *Dahlkemper, supra,* 165 B.R. at 154–55; and *Temp–Way, supra,* 80 B.R. at 703–05.

By way of contrast, when private parties are involved and the debtor exercises more than mere custodial rights in property, the courts have been very reluctant to sustain the argument that a constructive trust should be recognized. *See Columbia Gas, supra,* 997 F.2d at 1062–63; *In re Tri–State Mechanical Services, Inc.,* 141 B.R. 488, 493 (Bankr.W.D.Pa.1992) (court finds, without an extended discussion, that it would be inequitable to prefer the creditor asserting a trust relationship to other creditors of the debtor); and *McKay, supra,* 110 B.R. at 770–71 (although finding wrongful conduct on the part of the debtor, which would appear to give rise to a successful constructive trust theory, the court refuses to declare a valid constructive trust present because of improper conduct giving rise to "unclean hands" on the part of the putative trust beneficiaries).

Finally, in order to give the Plaintiffs every benefit of the doubt, we address briefly the suggestion in *Columbia Gas,* 997 F.2d at 1056, noted at page 554–55 n. 7 *supra,* that state law should be "displaced" when it is inconsistent with the example of a constructive trust included by Congress in the legislative history of § 541(d). To begin, we note

that we doubt that the *Columbia Gas* court intended to preempt state law and establish a general rule to be applied whenever a constructive trust issue arises under § 541(d). Indeed, the court's statement was only a small part of a much broader discussion concerning federal preemption only in those instances where the trust relationship is created by a federal statute. *Id.* at 1055–58. Such a conclusion would appear to be in conflict with the deference to state law principles emphasized in *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

Even if we must apply the rule of law suggested by the legislative history of § 541(d), we think that the Plaintiffs nonetheless would not be entitled to the imposition of a constructive trust. The general rule of law suggested by the legislative history of § 541(d) and the decision in *Columbia Gas* would be that, whenever a debtor serves as a mere conduit between the source of property or funds and the intended recipient, and when the property or funds are in its hands in that capacity, a constructive trust will be imposed for the benefit of the intended recipient, as in the cases cited at page 559 *supra. See Columbia Gas,* 997 F.2d at 1059 ("This insurance example [contained in the legislative history of § 541(d) ] evidences that Congress intended that when a debtor is a mere conduit for funds to travel from one party to another, it lacks an equitable interest in the monies."). *Cf. Yonkers, supra,* 58 B.R. at 982 (the debtor was not entitled to retain property because its "obligation was merely that of auditing claims and passing through payments, and the Debtor properly should be regarded as an intermediary."); and *Rowland, supra,* 140 B.R. at 209–10 (the debtor was entitled to retain property because no evidence was offered which showed it to be a mere conduit for payment to the movant).

We do not think that the Debtor in this case was a mere conduit, channelling all of the proceeds from the Receivables to the Plaintiffs. As we noted above, the patients, insurance companies, and third party payors all made their payments directly to the Debtor, most likely in complete ignorance of the role played by the Plaintiffs in generating

the underlying Receivables. Furthermore, the Debtor contributed toward the generation of the Receivables, and thus had a pecuniary interest in a portion of the Receivables collected. This is not a case where the debtor was a mere middleman who has no role in the generation of the property in question nor any interest in that property as it passed through its hands to the intended beneficiary.

The present case is more akin to the one situation presented to the *Columbia Gas* court in which it concluded that the monies held by that debtor were not held in constructive trust for the plaintiff. 997 F.2d at 1062–63. In that scenario, certain upstream gas suppliers argued that funds collected by the debtor from its customers which, under ordinary circumstances, would have been used to pay the upstream suppliers for goods and services, should be impressed with a constructive trust. *Id.* at 1062. The court disagreed, concluding that the debtor's obligations to the upstream suppliers were simply debts. *Id.* at 1063. The court reasoned that, like any retailer, the debtor charged its customers for the cost of purchasing the upstream suppliers' gas plus a reasonable rate of return. *Id.*

Likewise, the Receivables collected by the Debtor were intended to cover the cost of the Plaintiffs' services plus a return for Debtor. Moreover, the *Columbia Gas* court noted that the "chronology of the flow of money" was totally different in the case of the upstream suppliers from those other instances where the court did impose a constructive trust. *Id.* Specifically, the debtor ordinarily paid the upstream suppliers first, and then recouped its costs from its customers. *Id.* Similarly, the instant Debtor was obligated to pay the Plaintiffs regardless of whether it was able to collect the Receivables. Although we imagine that there was, in fact, no other source of payment for the Plaintiffs, the upstream suppliers effectively were put in the same position once the debtor in that case stopped paying them for their services while continuing to collect its costs and mark-up from its customers. This did not change the fact that, as in the case now before us, the *Columbia Gas* debtor's obli-

gation to the upstream suppliers was independent from the success of their collection efforts. Therefore, we conclude that the Plaintiffs, like the upstream suppliers, are merely creditors of the Debtor and share the same fate as their counterparts in *Columbia Gas.*

Thus, whether we apply the law of Pennsylvania, or the "mere conduit" federal rule suggested by the legislative history of § 541(d), the Plaintiffs are not entitled to the imposition of a constructive trust on the Receivables.

## D. CONCLUSION

We conclude that the Receivables in issue are properly included in the Debtor's estate and that the Plaintiffs' attempt to assert a constructive trust in same must fail. We will therefore enter judgment in favor of the Debtor.