**In re SHAREHOLDERS FUNDING, INC. d/b/a Affinity National Mortgage, Debtor.**

**Bankruptcy No. 94–17215 SR.**

United States Bankruptcy Court, E.D. Pennsylvania.

Nov. 2, 1995.

---

John A. Wetzel, Swartz, Campbell & Detweiler, Philadelphia, PA.

Charles M. Golden, Edmond George, Obermeyer, Rebmann, Maxwell & Hippel, Philadelphia, PA.

Francis J. Lawall, Pepper, Hamilton & Scheetz, Philadelphia, PA.

## *OPINION*

STEPHEN RASLAVICH, Bankruptcy Judge.

### *Introduction.*

Before the Court is a Motion entitled "Motion of Resource Bank to Modify the Automatic Stay of 11 U.S.C. § 362 and for Relief Under 11 U.S.C. § 105." In the former respect, the Movant, "Resource" seeks leave to recapture the incidents of ownership to two mortgage loans it transferred to the Debtor, Shareholders Funding, Inc. d/b/a Affinity National Mortgage ("SFI"), prior to the commencement of this Chapter 11 case. In the latter respect, Resource prays for the imposition of a constructive trust upon the loan documents and/or the stream of monthly payments now being made by the underlying homeowner-borrowers. Although not mentioned in its pleading, Resource at trial and in its Memorandum of Law raised the additional argument that the transactions in issue constitute executory contracts as between itself and SFI, such that the Court should require SFI to assume or reject the same pursuant to 11 U.S.C. § 365. The Motion and the alternative relief sought by Resource are opposed in all respects by SFI (through its Chapter 11 Trustee) and the Committee of Unsecured Creditors. ("The Committee") An evidentiary hearing was held August 23, 1995 and the issues have been briefed by the parties. For the reasons which follow the

Court has concluded that relief is unavailable to Resource on the facts presented. Its Motion accordingly must be denied in its entirety.

### Background.

Prior to its demise, SFI was engaged in business as an originating financier of residential mortgage loans and as a buyer of the same for resale to third party institutions in the "secondary market." The company discontinued ongoing operations at or very shortly after commencing its bankruptcy case, and the purpose of this case has thus become the liquidation of SFI's assets and the orderly windup of its affairs. A Chapter 11 Trustee was appointed on February 16, 1995, in the wake of certain unrebutted allegations of fraud and/or mismanagement.

The instant dispute concerns the purchase and resale side of the Company's former business. This aspect of the business, as noted, consisted of the purchase of mortgage loans by SFI from other originating lenders known as "correspondents." Ideally, the relationship of SFI with its various correspondents was intended to be governed by the terms of an executed "Mortgage Correspondent Agreement." (Exhibit R–1) This pre-printed agreement also incorporated by reference the entire contents of SFI's "Wholesale Manual." (Exhibit R–2). The latter manual described in extensive detail the various procedures to be observed by the parties from the start to the finish of a transaction. The nature of the exact relationship between SFI and Resource, a Virginia based lending institution in the business of originating and reselling residential mortgage loans, presents a threshold question because the ideal of a fully executed Mortgage Correspondent Agreement between the parties did not obtain. Rather, the Mortgage Correspondent Agreement introduced in this proceeding by Resource as Exhibit R–1 was signed by Resource only, and not by SFI.

In this regard, evidence at trial established that the president of Resource, Christopher Beale, modified the pre-printed document in various respects prior to signing it on October 12, 1993, and returning it to SFI. Upon its receipt the document was never subsequently executed by SFI. As an initial proposition, the Trustee and the Committee thus argue that no correspondent relationship ever existed between Resource and SFI, or that if one did it was not strictly governed by the terms of the Mortgage Correspondent Agreement and the Wholesale Manual. Resource disputes each of these points.

 As to the existence of a correspondent relationship between the parties, Resource again offered the testimony of its president. Beale testified that in telephone conversations with former SFI sales representative Beth McCartney he was verbally assured that the "changes" made by him to the pre-printed SFI Mortgage Correspondent Agreement were "no problem," and that Resource should consider itself a correspondent of SFI and conduct itself accordingly. (N.T. at 15) While the Committee objected to this testimony from Beale as hearsay, the Court, which initially reserved its ruling, has concluded that the testimony falls within the party admission exception to the hearsay rule codified in Federal Rule of Evidence 801(d)(2)(D) and is therefore admissible.[1] In further support of the existence of a correspondent relationship Resource pointed to various items of correspondence which were received by it from SFI and which were collectively admitted as Exhibit R–5. While certain of these documents are unhelpful, or at best inconclusive on the point in issue, at least two of them, being certain letters which were sent by SFI *en mass* to all of its correspondents and which were received by Resource after October 12, 1993, presumably as a member of such group, are probative and supportive of Resource's position. On the strength of both arguments the Court finds that for present purposes, a correspondent relationship did in fact exist between Resource and SFI. The exact terms of that relationship, however, are another matter.

---

1. The Court has considered and also rejects as incorrect the Committee's assertion that where the testimony of an employee is concerned, the party admission exception is available only if the employee in question remains in the particular employment position as of the time the testimony is offered. The exception, rather, requires only that the declarant employee have been employed at the time the statement in issue is made.

Resource argues, initially, that the terms and conditions of the Mortgage Correspondent Agreement (with the incorporated Wholesale Manual) as signed and sent by Resource to SFI represent a so-called "bible" between the parties, because the Wholesale Manual contains what is largely an industry-wide set of standard procedures to regulate the sometimes complicated and generally paper-intensive transactions between an originating lender and a loan wholesaler. Resource argues in the second instance for an interpretation of these documents which supports an entitlement to the relief it now requests.

The Trustee and the Committee respond that the absence of a fully executed Mortgage Correspondent Agreement between the parties precludes a finding that the terms of the documents in question provide the "four corners" to which the Court must look in ascertaining the terms of the parties' agreement. Rather, they argue, the Court should consider the written documents, but should also give regard to the parties' intentions as evidenced by their course of dealing. Alternatively, the Trustee and the Committee urge the Court, even if it accepts Resource's "four corners" argument, to adopt an interpretation of the contract documents which weighs against Resource's entitlement to the relief now sought. The import of these issues is pivotal. This conclusion stems in part from an appreciation of the history of the parties' dealings in the very limited series of transactions between them.

The Wholesale Manual describes a two step process for the sale of a mortgage loan to SFI. First, certain data on the loan must be submitted by the correspondent to SFI for "underwriting" or credit-type approval. Once this hurdle is cleared the correspondent is obliged to comply with numerous additional "closing" conditions detailed in the Wholesale Manual. The latter process consists in large part of the submission by the correspondent of the underlying documentation which supports the mortgage loan. According to the Mortgage Correspondent Agreement (at Article IV ¶ D) this documentation when submitted must be in "purchasable form." The Wholesale Manual (at article X)

in turn contemplates a 72 hour turnaround review of this material by SFI leading to one of three decisions, as follows:

## E. REVIEW STATUS

### 1. REJECTED

Any loans rejected by SFI will be returned to the Correspondent within 24 hours of the SFI review. Files will be returned via regular mail unless otherwise requested by Correspondent.

### 2. SUSPENSION

If a loan is put in "Audit Suspense", the Correspondent will be notified regarding outstanding items, first by phone, with a follow-up fax documenting the outstanding conditions.

All suspense items must be submitted for review prior to the expiration date of the loan or the loan may be subject to repricing.

### 3. APPROVED

Approved loans may be approved with follow-up items due, or with no additional items due to SFI. Follow-up items are due to SFI within 72 hours of the date of the Purchase Approval is provided to the Correspondent.

Article X of the wholesale manual at ¶ G supplements the foregoing with the following caveat:

## F. FINAL DOCUMENTS

All final documentation must be delivered to SFI within 75 days of purchase of the loan. SFI will issue a report on a monthly basis to determine all outstanding documentation; however, the Correspondent is responsible for tracking this documentation on their own behalf.

A total of but four loan transactions arose between Resource and SFI. Of these, one failed at the credit approval stage. Another, the Nooney loan, was completed in its entirety; that is, the loan was resold by SFI to a third party and the proceeds, less SFI's fee, were sent to Resource. The third and fourth transactions are known as the Steinert and Cash loans, and are those which are at issue herein. The Steinert loan was resold by SFI to the Federal National Mortgage Association ("Fannie Mae") however the proceeds that were paid to SFI upon that resale were

kept by it and never sent to Resource. The Cash loan was being readied for resale to a known third party buyer, but closing had been delayed pending SFI's receipt of some additional documents, as well as the resolution of certain questions concerning a mortgage modification agreement that had been executed by Resource and the borrower sometime subsequent to the original loan closing. In connection with the Steinert and Cash loans, Resource had in each case *endorsed the underlying promissory note in blank* before sending it to SFI for review. Then, before receiving written approval of either transaction (let alone payments) Resource *recorded a fully executed assignment of mortgage in favor of SFI*. In the case of the Steinert loan, SFI in turn reendorsed the Note and reassigned the mortgage and all related documents to the third party buyer. In the case of the Cash loan, since the third party sale was still pending at the time of SFI's November 3, 1995 bankruptcy filing, the mortgage documents of record are still in the possession of SFI and still reflect SFI as the owner/mortgagee.[2] . .

Resource, as noted, argues that the parties relationship is governed by the terms of the Wholesale Manual. In this respect, Resource stresses the fact that it never received the written approval contemplated in Article X of the Wholesale Manual for either of the Steinert or Cash loans. With respect to both loans, but more the Cash loan in particular, Resource argues that the loan sales were still in the audit suspense stage described in the Wholesale Manual, such that Resource remained the equitable owner of those assets notwithstanding having transferred colorable legal ownership of the loans to SFI through endorsement of the notes and recordation of mortgage assignments. This notion underpins Resources argument for the imposition of a constructive trust as to both loans.

The Trustee and the Committee respond to the foregoing by noting that in the only transaction to be fully consummated by the parties (the Nooney loan) the requirement of a formal written approval had been disre-

garded. That loan, instead, was simply resold by SFI when the documentation package was completed, and the net proceeds were sent to Resource upon closing. The Trustee and the Committee further argue that the Steinert loan certainly cannot be viewed as still being in "audit suspense," since it had already been resold by SFI. More to the point, they argue that these facts indicate an intention of the parties to conduct business on terms at variance with the Wholesale Manual. The Trustee and the Committee thus urge an interpretation of the parties relationship, based partly on the written documents and partly on their course of dealing, which allows for the possibility of a completed loan sale even in the absence of a "written approval." They argue that a finding that Steinert and Cash represented completed sales, at least as between Resource and SFI, effectively undercuts Resource's claim to even a residual equitable interest in the subject loans.

Even if the strict terms of the Wholesale Manual are found to govern both transactions, the Trustee and the Committee stress that the submission of final documents conveying legal title to the loans to SFI was not technically required under the Wholesale Manual until 75 days after purchase of a loan. Thus they argue that even if either sale were to be deemed incomplete as between Resource and SFI, Resource's unsolicited and premature decision to transfer ownership of the loans to SFI still undercuts its entitlement to the remedy of a constructive trust.

Having carefully reviewed these issues, the Court concludes that the Trustee and the Committee have the better part of the argument.

***Discussion.***

### Constructive Trust

■ Resource's argument for the imposition of a constructive trust with respect to the Cash and Steinert Loans is based on § 541(d) of the Bankruptcy Code, which provides:

been lost by SFI.

---

**2.** Technically speaking, it appears that the original Cash loan documents themselves have since

[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). While some courts differ on the issue, case law in this jurisdiction teaches that the § 541(d) exemption indeed applies to property held by the debtor in constructive trust for another. *In re Sacred Hospital of Norristown,* 175 B.R. 543, 549 (Bankr.E.D.Pa.1994) (citing *In re Columbia Gas Systems, Inc.,* 997 F.2d 1039, 1059 (3d Cir.1993), cert. denied, ── U.S. ──, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994)).

■ The propriety of the imposition of a constructive trust is governed in the first instance however by applicable state law, which in this case the Court determines to be Pennsylvania law. *Jaffke v. Dunham,* 352 U.S. 280, 281, 77 S.Ct. 307, 309, 1 L.Ed.2d 314 (1957); *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 94–97 (3d Cir.1994); *In re Sacred Heart Hosp. of Norristown,* 175 B.R. 543, 554 (Bankr.E.D.Pa.1994).

■ Under Pennsylvania law, a constructive trust is not really a trust at all but rather an equitable remedy. *Buchanan v. Brentwood Savings and Loan Ass'n,* 457 Pa. 135, 150, 320 A.2d 117, 126 (1974). Like all remedies in equity, it is flexible and adaptable. *Id.* "A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Buchanan v. Brentwood Savings and Loan Ass'n,* (quoting Scott, Law of Trusts § 462 (3d ed. 1967)). *See also, Yohe v. Yohe,* 466 Pa. 405, 353 A.2d 417 (1976). *Gee v. Eberle,* 279 Pa.Super. 101, 420 A.2d 1050 (1980). Generally, however, an equitable duty to convey property to another arises only in the presence of fraud, duress, undue influence, mistake, or abuse of a confidential relationship. *Yohe v. Yohe,* 466 Pa. at. 411, 353 A.2d at 420 (citing *Chambers v. Chambers,* 406 Pa. 50, 54, 176 A.2d 673, 675 (1962));

*see also, Roberson v. Davis,* 397 Pa.Super. 292, 580 A.2d 39, 40–41 (1990).

■ The presumption of right in an action to impose a constructive trust lies in favor of the one in whom legal title is situated. *In re McKay,* 110 B.R. 764, 770 (Bankr. W.D.Pa.1990) (citing *Metzger v. Metzger,* 338 Pa. 564, 14 A.2d 285 (1940)). The party seeking the imposition of a constructive trust moreover bears a heavy burden of proof; the evidence must be "clear, direct, precise and convincing." *In re I.D. Craig Service Corp.,* 125 B.R. 453, 456 (Bankr.W.D.Pa.1991) (citing *Roberson v. Davis,* 397 Pa.Super. 292, 580 A.2d 39, 41 (1990)). In this instance the Court has determined that the record does not contain the requisite clear and convincing evidence that a constructive trust should be imposed.

■ In the first place, none of the typical touchstones for the imposition of a constructive trust are present here, i.e., fraud, duress, undue influence, mistake, or abuse of a confidential relationship. Still, it is clear that the standards for the imposition of a constructive trust are not rigid and inflexible. *See In re Joseph B. Dahlkemper, Co.* 165 B.R. 149, 154 (Bankr.W.D.Pa.1994) (no "Bright Line" test for imposition of a constructive trust). Thus, many courts and commentators focus, as Resource does, on whether failure to impose a trust will result in unjust enrichment, even absent some type of wrongful conduct. *In re Kulzer Roofing, Inc.* 139 B.R. 132, 140–141 (Bankr.E.D.Pa.1992); 10 Summary of Pennsylvania Jurisprudence 2d 33:4 at 594–5 (Law.Co-op.1993). In this respect Resource notes that in a routine transaction between these parties SFI could expect to earn less than 1% of a loan's face amount on its resale. A ruling against Resource in the matter *sub judice* will result in SFI retaining (ultimately) the total proceeds from sale of both loans. This, Resource argues, amounts to unjust enrichment.

Resource's claim of entitlement to a constructive trust thus may be said to hinge on two related arguments: (1) that it retained equitable title to the Loan Documents, because they were never approved or rejected by SFI and therefore remained in "suspense"; and (2) that the Debtor's bankruptcy

estate will be unjustly enriched if a constructive trust is not imposed and the estate is allowed to retain the entire proceeds generated from sale of the Notes and Mortgages, as opposed to the comparatively small anticipated profit SFI was to have received from such sales. While there is an obvious degree of appeal to these arguments, under close analysis they break down.

Resource's argument that it retained an equitable interest in the subject loans requires one to accept the proposition that the loans remained in the "audit suspense" stage of SFI's review process; in other words, that "sale" of the loans from Resource to SFI had not yet been completed. The Court, however, declines Resource's "4–Corners" interpretational argument, and concludes instead that since the requirement of written approval had been disregarded or waived by the parties in the past, that requirement may not now be used to avoid a sale which had otherwise been completed between the parties in accordance with their ordinary course of dealing. Resolving the Steinert loan on this basis is relatively easy, particularly since it had already been resold by SFI. The Cash loan however is a closer call.

Resource would argue that even if the Steinert Loan is deemed to have been sold, the Cash loan, with its incomplete documentation package, should not be so viewed, because nothing in the parties' history suggests that a loan supported by an incomplete document package would be considered by the parties to be sold. The evidence on this point, however, was equivocal at best. Resource's president, Beale, gave testimony the clear import of which was that Resource itself viewed the sale transactions as complete upon submission of the "final" documents, with the exception only of Resource's receipt of the "purchase price" from SFI. Put differently, Beale's testimony indicated that Resource viewed both loan sales as credit sales with unfettered ownership of the assets passing from Resource to SFI upon submission of the documentation packages,

leaving Resource as the holder of an outstanding account receivable.

Measured against this was testimony elicited from SFI's former Chief Operating Officer which confirmed that, as a technical matter, the sale of neither loan had occurred since written approval had not issued in accordance with Article X of the Wholesale Manual. Here though, one must again bear in mind that the technicalities of the Wholesale Manual had been disregarded by the parties in the past. The Nooney Loan was "sold" without a written approval. The Steinert Loan too, was resold to Fannie Mae without any prior written approval having been furnished to Resource. Indeed, the Steinert loan, was sent to SFI on or about June 6, 1994 and was promptly sold by SFI to Fannie Mae on June 20, 1994. Yet no written approval had ever been issued by SFI, nor apparently had any demand for one even been made by Resource as late as the time of the Debtor's November 1994 bankruptcy filing.

 Resource itself appears to acknowledge herein that the Steinert loan itself has passed beyond the ambit of this proceeding through retransfer of the loan documents from SFI to Fannie Mae.[3] Its constructive trust argument as to the Steinert loan presumably seeks to impress a trust upon unsegregated funds in the Debtor's estate in an amount equal to the net proceeds received from sale of the Steinert loan. Its argument in this context, again however, is predicated on the notion that this transaction between itself and Resource was incomplete because it had never officially been approved in writing by SFI. For the reasons hereinbefore discussed, the Court finds this argument unpersuasive. It is abundantly clear from the parties' course of conduct in both the Nooney and the Steinert situations that the requirement of a written approval was a detail the parties ignored. The Court accordingly attaches relatively little importance to the absence of a technical written approval of either the Steinert or the Cash loans, nor to

**3.** It is relatively well established that courts will not impose a constructive trust on property which has passed to a bona-fide purchaser for value. *B.J. McAdams, Inc. v. Boggs,* 439 F.Supp. 738, 752 (E.D.Pa.1977); *See also, C.H. Robinson Co. v. Trust Co. Bank, N.A.,* 952 F.2d 1311 (11th Cir.1992).

the fact that under a strict reading of the Wholesale Manual an unapproved loan remained in audit suspense. Conversely, the Court attaches relatively great importance to the fact that Resource itself apparently viewed the transactions as being complete upon submission of the document package, and to the fact that Resource itself departed from the literal terms of the Wholesale Manual by prematurely transferring all indicia of ownership of the loans to SFI.[4]

The totality of these facts and circumstances persuades the Court that the two loan sale transactions, as between Resource and SFI, were in fact complete; that is, that each loan had indeed been effectively sold in its entirety by Resource to SFI upon transmittal of the endorsed, recorded loan documents. Rather than remaining equitable owner of the loans, therefore, the Court concludes that Resource is merely the holder of an unsecured account claim against SFI. This determination in turn precludes a finding that Resource is entitled to the extraordinary equitable remedy of a constructive trust.

■ While this resolution works what ·may appear to be a harsh result upon Resource, one must bear in mind that harsh treatment is frequently the order of the day in bankruptcy cases. The provisions of the bankruptcy code are designed to ensure that the harm which frequently befalls creditors is at least borne among similarly situated creditors without discrimination. In the instant case the Debtor's schedules indicate that it has approximately 600 other creditors holding claims of approximately $1,700,000. Their ·rights, too, are at issue herein. Put differently, "Imposition of a constructive trust must include a consideration of the relative equities between the proposed trust beneficiary and other creditors." *In re Black & Geddes* 35 B.R. 830, 836 (Bankr. S.D.N.Y.1984).

■ In this respect, the Court agrees with observations expressed by Judge Scholl in *In re Sacred Heart Hosp. of Norristown,* 175 B.R. 543, 556 (Bankr.E.D.Pa.1994):

[W]e must be careful not to improperly split unjust enrichment from its equitable underpinnings. In other words, we must not be quick to impose a constructive trust unless the circumstances of the matter before us evoke the court's equity and demand a remedy, *e.g.,* a case of a defendant who has profited by its wrongdoing or breach of a confidential relationship. It is this wrongdoing or breach of confidential relationship which gives rise to the "equitable duty" to transfer the proper in question to the· party which equity seeks to protect.

As Judge Scholl points out, without such an equitable predicate, every debtor-in-bankruptcy would be "unjustly enriched" and every unsecured creditor entitled to a constructive trust. *Id.*

Or, as stated differently by Judge Thomas of the Middle District:

While we are mindful that an entity which receives something for no consideration, and not as a gift, is unjustly enriched, we are compelled to observe that if that were the only standard, then every creditor in every bankruptcy case could claim to be the beneficiary of a constructive trust and therefore not subject to the distribution schedules outlined by the Bankruptcy Code. *In re Globe Store Acquisition Co., Inc.,* 178 B.R. 400, 404 (Bankr.M.D.Pa. 1995).

The above cautions do not overshadow the Court's conclusions that on this record the Movant, Resource, has failed to meet the heavy evidentiary burden for the imposition of a constructive trust. They are noted rather to aid in understanding a result which to a layman might seem difficult. Indeed, the fertile ground for tension which obviously exists in this area no doubt accounts for the divergent viewpoints which exist among the circuits. The Sixth Circuit, for instance, has determined that the Bankruptcy Court should not recognize a constructive trust at all unless that trust had been imposed by a non-bankruptcy court prior to the filing of the bankruptcy. *In re Omegas Group, Inc.,*

---

4. Indeed, Resource went so far as to send a servicing release or "goodbye" letter to the

homeowner-borrower advising them to remit future monthly payments to the new mortgagee.

16 F.3d 1443 (6th Cir.1994) The circuit court in *Omegas* reasoned that a constructive trust is only a remedy, and that entitlement to a remedy is not an interest in property. *Id.* In *In re Markair,* 172 B.R. 638 (9th Cir. BAP 1994), the Bankruptcy Appellate Panel, without citing *Omegas,* appears to adopt its reasoning by relying on the strong arm powers of the Trustee to defeat an inchoate claim to a constructive trust. There is an appeal to the latter rationale in the instant case when one pauses to recognize that the ostensibly unjustly enriched debtor no longer exists in this case. Rather, the Court is presented with a liquidating estate overseen by an innocent Trustee. Arguably, this elimination of the notion of unjust enrichment completely dissipates any basis for the imposition of a constructive trust.

Before leaving this area, the Court will briefly address Resource's argument that it should not be penalized for transferring ownership of the subject loans to SFI prior to shipping them to SFI for review, because the Mortgage Correspondent Agreement required loan documents to be submitted in "purchasable form." The Court sees this argument as flawed. In the first place the evidence was inconclusive that this phrase was intended to mean that complete ownership of a loan had to be transferred to SFI concurrently with the submission of a loan document package. On the contrary, it appears that the "purchasable form" requirement was merely intended to ensure that loan document packages were complete, and that the individual documents were in reasonably standard form so as to be readily marketable to third parties. Moreover, the evidence suggested that even if the phrase was intended to have the meaning Resource urges, there were steps Resource might have taken to protect itself. Evidence at trial, for instance, established that other similarly situated lenders utilize a "Bailee letter" to clarify their residual interest in a loan when ostensibly transferring complete ownership thereof to a third party. Resource's president, Beale, testified that Resource did not utilize Bailee letters because it did not utilize a warehouse bank. There is nothing, however, to suggest, that it could not have employed the practice. Resource's "compulsion" argument fails to persuade the Court that its conclusions on the constructive trust issue are amiss. Rather, the Court finds itself in agreement with the Trustee and the Committee, both of which argue that Resource's premature transfer of ownership of the subject loans to SFI, without protection, amounted to a calculated business risk, against which the *post hoc* insurance of a constructive trust is not now available.

To recapitulate, in the absence of a document between Resource and SFI which definitively establishes a trust relationship between them, this Court, consistent with the mandate of *Columbia Gas supra,* has looked to the language of the parties, their conduct, and other circumstances surrounding the transaction probative of their intent. Having done so, the Court cannot say that it has before it the "clear, direct, precise and convincing" evidence necessary to justify the imposition of a constructive trust. Resource's prayer for this relief must therefore be denied.

### Executory Contract

As an alternative basis for relief, Resource argues that the Cash loan transaction is an executory contract which must either be assumed or rejected by the Trustee pursuant to § 365 of the Bankruptcy Code. In considering this argument, the Court begins with the definition of executory contract formulated by Professor Vern Countryman, and adopted by the Third Circuit Court of Appeals, that for purposes of § 365: "[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other. Countryman, *Executory Contracts in Bankruptcy, Part 1,* 57 Minn.L.Rev. 439, 460 (1973); *Enterprise Energy Corp. v. United States (In re Columbia Gas System, Inc.),* 50 F.3d 233, 239 (3d Cir.1995) (citing *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 39 (3d Cir.1989)). Under this definition, unless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365. *In re*

*Columbia Gas System, Inc.*, 50 F.3d at 239. The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed. *Id.* (citing *Collingwood Grain, Inc. v. Coast Trading Co. (In re Coast Trading Co.)*, 744 F.2d 686, 692 (9th Cir.1984)). A determination that the Cash loan transaction is an executory contract thus requires a finding that the obligations of both SFI and Resource at the time SFI filed bankruptcy were so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

 In order to determine whether the parties had not yet completed their respective obligations pre-petition, the Court must consider Pennsylvania contract principles. *In re Columbia Gas System*, 50 F.3d at 239 n. 10. (citations omitted). In this respect, Pennsylvania contract law provides:

> In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished from the document itself when the terms are clear and unambiguous.

*Walton v. Philadelphia Nat'l Bank*, 376 Pa.Super. 329, 545 A.2d 1383, 1388 (1988).

 Based on its interpretation of the Mortgage Correspondent Agreement, Resource, of course, takes the position that neither SFI, nor itself had completed their respective obligations, such that the failure of either to now complete performance would constitute a material breach. The argument is persuasive with respect to SFI's failure to complete performance as of the petition date. SFI had not paid Resource Mortgage for the purchase of the Steinert Loan, nor had it completed the sale of the Cash Loan Documents to an "end investor," as the parties intended. The Court is unpersuaded, however, that Resource had not substantially performed its obligations under the parties' agreement by the time SFI filed bankruptcy.

The evidence showed that both SFI and Resource intended that the Cash Loan would be sold to an "end investor" through a two-step process: (1) Resource was required to transfer the Loan Documents to SFI in "purchasable form," and (2) SFI would review the package of Loan Documents received and, if in proper form, attempt to sell the Loan Documents to an "end investor," with payment being made to Resource by SFI after it had received payment from the end investor. It is particularly noteworthy that both Resource and SFI intended that Resource at some point would assign its rights under the Loan Documents to SFI, and then SFI would assign those rights to the actual "end investor." In other words, it was the intention of the parties that Resource would sell and assign its enforceable rights under the Loan Documents to SFI, and that SFI would, in turn resell and reassign those rights to an "end investor." Put differently, it was not, the parties' intention that SFI would act solely as a *conduit* of the Loan Documents between Resource and an end investor.

In the Court's view, Resource had substantially performed its obligations to SFI at the time of the bankruptcy filing. Resource admits that legal title to the Cash Loan Documents was transferred to SFI before the bankruptcy was filed. Moreover, Resource admits that it forwarded the original Cash Note endorsed in blank to SFI in June 1994, with the balance of the post-closing documents as prescribed by the Wholesale Manual. Resource also admits that on or about July 25, 1994, it forwarded to SFI a recorded Assignment of the Deed of Trust naming SFI as the immediate and sole assignee. Finally, Resource issued a Goodbye Letter dated June 29, 1994, to the Cashs, which notified them that future loan payments and any other questions concerning their loan should be directed to SFI at the address and phone number provided. On the basis of those facts, it is apparent that Resource had assigned all of the enforceable rights represented by the Cash Loan Documents to SFI, and was simply awaiting the receipt of payment from SFI.

Nevertheless, Resource maintains that it had not completed its obligations to SFI

prepetition. In this respect, Resource relies on the fact that, as of October 12, 1994, the end purchaser Chase Federal Bank, required the completion of a new Modification Agreement between the Cashs and Resource, and also on the fact that a final list of missing items necessary to consummate SFI's sale of the Cash Loan to Chase had yet to be forwarded by SFI to Resource. The Cash Loan Documents thus remained in "suspension," according to Resource, supporting its argument now that Resource could not possibly have fully performed its obligations to SFI. The Court will consider Resource's specific contentions in reverse order.

As to Resource's argument that the Cash Loan Documents remained in suspension, the Court finds that its argument is inconsistent with its actions. It is clear that Resource did not require approval or rejection of any loan submitted to SFI within 72 hours of submission. Indeed, Resource did not require, and SFI never provided, a written approval of any loan to Resource at any time. In each instance, including the Nooney, Steinert and Cash loans, Resource transferred Loan Documents and then promptly proceeded to record and assign the respective mortgages, and therefore the right to enforce the underlying loans, to SFI, before receiving any response from SFI, *notwithstanding the fact that the Wholesale Manual itself did not require Resource to record and/or assign the mortgages to SFI until 75 days after SFI has purchased the loan.* On these facts, it is evident that, notwithstanding the absence of a technical approval, Resource has fully performed its obligations to SFI.

Resource's second argument, i.e., that it had not yet provided a number of missing items necessary to consummate SFI's sale of the Cash Loan Documents to Chase Federal Bank was also seriously undercut by the testimony of its President. On this score, Beale testified that after receipt of a list of items that Chase Federal Bank would require to purchase the Cash loan from SFI, Exhibit R–11, he advised SFI that "a lot of the information had already been sent in the original package [to SFI]." (N.T. 26–27.) Based on Beale's testimony, it would appear that Resource had already provided most, if not all, of the items which were required by Chase Federal Bank before it would purchase the Cash Loan. This again supports the conclusion that its obligations from a contract standpoint were largely complete.

Resource's final argument is that it had not yet completed all the steps necessary to transfer the Cash Loan to Chase Federal Bank, because Chase Federal Bank still requires the completion of a new Modification Agreement between the Cashs and Resource. Other courts have considered and rejected similar arguments. For example, in *Mitchell v. Streets*, 882 F.2d 233, 235 (7th Cir.1989), the court considered whether the failure of a vendor to deliver legal title to the purchaser of real property rendered the transaction an executory contract for purposes of § 365. The court noted that the purchaser had become the equitable owner of the property under state law upon entry into an installment land contract. As such, the purchaser was entitled to immediate possession of the property and was required to pay all relevant taxes and costs. In contrast, the vendor's only remaining obligation was to deliver legal title upon completion of the payments. On those facts, the court determined that the delivery of legal title is a mere formality and does not represent the kind of significant legal obligation that would render the contract executory. *Id.* A similar determination is warranted here.

As previously noted, Resource has assigned all of its enforceable rights represented by the Cash Loan Documents to SFI, and is simply awaiting the receipt of payment from SFI. Its remaining obligation to complete a new Modification Agreement, which is satisfactory to Chase Federal Bank, pales in comparison to the legal significance of Resource assigning all its rights to SFI. The insignificance of that obligation is further underscored by the fact that Resource is under a continuing obligation to provide necessary documentation to SFI even after it receives payment for a loan. Article 10 ¶ G. Thus, the Court concludes that Resource's remaining obligation to provide a new Modification Agreement does not present the kind of significant legal obligation that would render the instant contract executory. On the

**162**

contrary, any such obligation appears largely ministerial.

Having concluded that Resource has substantially performed its obligations to SFI, and having rejected Resource's specific arguments to the contrary, the Court concludes that the Cash Loan is not an executory contract for purposes of § 365.

An Order consistent with the foregoing conclusions accompanies this Opinion.